

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOSEPH DEMOUCHETTE, JR., et al., | ) ) ) |
| Plaintiffs, | ) No. 09 C 6016 ) |
| v. | ) ) Judge Blanche Manning |
| SHERIFF OF COOK COUNTY THOMAS DART, in his official capacity, COOK COUNTY, a unit of local government, et al., | ) ) ) Magistrate Judge Arlander ) Keys ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

On September 28, 2008, Plaintiff Joseph Demouchette ("Plaintiff") was found dead in his jail cell operated by the Cook County Department of Corrections ("CCDC") after taking his own life by hanging. Almost one year later on September 26, 2009, Plaintiff's mother, Arnella Demouchette, filed this suit against Cook County and the Sheriff of Cook County, Thomas Dart ("Cook County" or "the County"), as well as unnamed John Doe correctional officers, John Doe employees of Cook County employed by Cermak Health Services, and numerous correctional officers who worked at the CCDC at the time of Plaintiff's death (collectively, "the individual defendants"). Alleging violations of his rights under the Fourteenth Amendment, 42 U.S.C. § 1983, wrongful death, the intentional infliction of emotional distress, and negligence, Plaintiff brings this action against Mr. Dart in

his official capacity and against the correctional officers and Cermak employees in their individual capacities. Plaintiff also asserts a survival action against all defendants as well as vicarious liability and indemnification against Cook County. Currently before the Court is the County's motion to bifurcate Plaintiff's § 1983 claims against it pending the resolution of claims against the individual defendants and to stay discovery on claims involving Cook County's customs and policies related to the operation of the CCDC. For the reasons explained below, the motion is granted.

## Factual Background

The amended complaint alleges that Mr. Demouchette, a heroin addict who had previously been held several times at the CCDC on charges related to his illegal drug use, was arrested on September 27, 2008 and placed in the jail as a pretrial detainee. (Amend. Compl. at ¶¶ 12-14.) In contrast to his prior detentions, Mr. Demouchette was arrested on this occasion for domestic battery. (Reply at 8.) Upon his arrival, Mr. Demouchette underwent a medical screening by Cermak Health Services ("Cermak"), which operates medical services at the CCDC for Cook County. The medical intake form shows that Mr. Demouchette admitted to using tobacco but answered "no" to other questions involving his substance use, including alcohol, methadone, and all illicit drugs. (*Id.* at Ex. 2.) Cermak also

undertook a Brief Primary Psychological Screening of Mr. Demouchette, in which he again denied using drugs, feeling suicidal, or having attempted suicide in the past. (*Id.*)

Mr. Demouchette was subsequently placed in the general population of the CCDC in Tier 2-H with cellmate Adair Davidson. According to Mr. Davidson's later statement, Mr. Demouchette was experiencing both physical and emotional distress when he was placed in Tier 2-H on the evening of September 27. For example, Mr. Demouchette expressed concerns about relations with his girlfriend and told Mr. Davidson the next morning that he had even considered committing suicide because of tensions in his relationship. Mr. Demouchette was also visibly ill and vomited two or three times when he first arrived in Tier 2-H. He mentioned to Mr. Davidson that he was "dope sick" because for the past twenty-four hours he had been off heroin, a drug which Mr. Demouchette allegedly took in large quantities, and he told Mr. Davidson that his addiction had also contributed to his suicidal feelings. (*Id.*)

According to the amended complaint, Mr. Demouchette tried to attract the attention of guards throughout the night of September 27 to no avail, (Amend. Compl. at ¶ 20), and the next day he began telling Mr. Davidson that he planned to "fake hang" himself in order to get medical attention at the Cermak Hospital. (Reply at Ex. 2.) Mr. Davidson asked him to wait until the correctional

3

officer on duty returned to the area, but Mr. Demouchette tied
his bed sheet to a window, placed the sheet around his neck, and
began to act on his threat. Agitated by what he was witnessing,
Mr. Davidson called out to other inmates and the correctional
officer on duty for help, but he did not personally interfere for
fear of creating more harm than good. By the time the CCDC
officer arrived, Mr. Demouchette had already become unconscious,
and his face and fingernails had turned pale. Paramedics
eventually arrived on the scene about forty-five minutes later
and began transporting Mr. Demouchette to Mt. Sinai Hospital,
where he was pronounced dead. (*Id.*) An autopsy performed the
following day at the Cook County Medical Examiner's Office
confirmed that Mr. Demouchette's death was a suicide caused by
hanging. (Amend. Compl. at ¶ 37.)

## Discussion

Federal Rule of Civil Procedure 42(b) states, in relevant
part, that "[f]or convenience, to avoid prejudice, or to expedite
and economize, the court may order a separate trial of one or
more separate issues, claims, crossclaims, counterclains, or
third-party claims." Fed. R. Civ. P. 42(b). As Rule 42(b)'s
language suggests, courts have broad discretion in deciding
whether to bifurcate issues presented in a case and to try them
separately. *Krocka v. City of Chicago*, 203 F.3d 507, 516 (7th
Cir. 2000). Certain conditions, however, must be met in order to

support a motion to bifurcate. A court must determine if
separate trials would avoid prejudice to a party or serve the
purpose of judicial economy, though only one of these criteria
need be met. *Houseman v. U.S. Aviation Underwriters*, 171 F.3d
1117, 1121 (7th Cir. 1999); *MCI Communications v. Am. Tel. & Tel.
Co.*, 708 F.2d 1081, 1166 (7th Cir. 1983). This standard also
applies when, as here, a plaintiff brings a § 1983 claim against
a municipality pursuant to *Monell v. Dep't of Social Servs. of
City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611
(1978). *See Treece v. Hochstetler*, 213 F.3d 360, 364-65 (7th
Cir. 2000); *Medina v. City of Chicago*, 100 F. Supp.2d 893, 894
(N.D. Ill. 2000) ("There is no question that a district court has
the discretion to sever a *Monell* claim against a municipality
from claims against individual police officers and stay
litigation of the *Monell* claim until the rest of the case is
resolved.") (internal quote and citation omitted).

## I. The Liability Issues

Plaintiff claims that Cook County is liable to him because
his alleged constitutional harm was caused, in part, by the
County's customs and policies (Amend. Compl. at ¶ 57), a ground
for municipal liability specifically authorized by *Monell*. *See
Monell*, 436 U.S. at 690, 98 S.Ct. at 2035-36. The County
contends that the *Monell* claims against it should be bifurcated
from Plaintiff's claims against the individual defendants because

Plaintiff cannot proceed with his *Monell* claims without first showing that the individual defendants are liable to him under § 1983. (Def's. Mot. at 6-7.) If Plaintiff's claims against the individuals fail, the County contends, there will be no need for a trial on the *Monell* claims. Plaintiff responds that his *Monell* claims are independent of the individual defendants' liability because the Seventh Circuit's decision in *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 304 (7th Cir. 2010) allows him to proceed against the County even if none of the individual defendants are found to be liable under § 1983.

In *Thomas*, the Seventh Circuit addressed whether the Supreme Court's ruling in *City of Los Angeles v. Heller*, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) established a firm rule requiring a plaintiff to show individual officer liability under § 1983 before a *Monell* claim could succeed. *Heller* had determined that, where a plaintiff sues a municipality based on the actions of one of its employees, the plaintiff cannot prevail on the *Monell* claim without first showing that an individual defendant violated his constitutional rights. *See Heller*, 475 U.S. at 799, 106 S.Ct. at 1573. The Court did not state that a defendant must be liable for such a harm. *See id.* *Thomas* concluded that *Heller* does not mean that a plaintiff can never succeed on a *Monell* claim against a municipality without first showing that an officer is liable to him for violating his rights

6

under § 1983. *Thomas*, 604 F.3d at 305. As the Seventh Circuit noted, no affirmative defense had been presented to the jury by the individual officers in *Heller*. *Id.* at 304-05. Had they asserted a defense such as qualified immunity, it would have been possible for a jury to conclude (1) that the defendants had violated the plaintiff's rights, but (2) that they were not liable for that violation based on the asserted defense. *Id.* at 304. "In that case," the Seventh Circuit concluded, "one can still argue that the City's policies caused the harm, even if the officer was not individually culpable." *Id.* Accordingly, the Seventh Circuit set forth three factors to consider in determining whether a municipality's liability depends on the actions of its officers: (1) the nature of the constitutional violation that the plaintiff alleges; (2) the theory of municipal liability that supports the *Monell* claim; and, (3) the defenses that the individual defendants have asserted. *Id.* at 305.

Plaintiff argues that he satisfies the initial *Thomas* requirement because, like that case, his action also involves a claim that the defendants were deliberately indifferent to his medical needs. (Resp. at 5-7.) In support, he distinguishes his position from the County's by pointing out that the County relies primarily on excessive force cases to bolster its bifurcation argument. Standing alone, however, the fact that both *Thomas* and this case involve the same cause of action is not sufficient to

show that Plaintiff's *Monell* claims are independent of those asserted against the individual defendants. *Thomas* did not distinguish between deliberate indifference actions and other *Monell* claims such as excessive force, and courts have cited *Thomas* in deciding whether to bifurcate a variety of *Monell* actions. *See, e.g., Clarett v. Suroviak*, No. 09 C 6918, 2011 WL 37838 (N.D. Ill. Jan 3, 2011) (applying *Thomas* to a false arrest claim); *Terry v. Cook County Dep't of Corrections*, No. 09 C 3093, 2010 WL 2720754 (N.D. Ill. July 8, 2010) (involving a deliberate indifference action); *Evans v. City of Chicago*, No. 10 C 543, 2010 WL 3075651 (N.D. Ill. Aug. 5, 2010) (finding *Thomas* relevant to a warrantless search issue).

As these cases suggest, the decision of whether to bifurcate issues under Fed. R. Civ. P. 42(b) does not stem so much from the nature of the cause of action as from a careful consideration of the specific facts that support a plaintiff's claims. *See Elrod v. City of Chicago*, Nos. 06 C 2505 & 07 C 203, 2007 WL 3241352, at *2 (N.D. Ill. Nov. 1, 2007) ("[T]he outcome of each decision is dependent upon the facts of that particular case."). Even when courts have relied on *Thomas* to decide against bifurcating *Monell* claims in deliberate indifference suits, moreover, they have not always found the claim itself to be the determining factor. *See Terry*, 2010 WL 2720754, at *3 ("[O]n the current record before the Court, it is simply too early to tell whether

Plaintiff's claims are analogous to those in *Thomas* – which also is a deliberate indifference case – or more like the claims of plaintiffs in excessive force cases where bifurcation routinely has been granted."). In the absence of an argument directly addressing the deliberate indifference action at issue here, the Court finds that Plaintiff has not shown that his cause of action is directly analogous to the one in *Thomas*.

Neither party directly addresses *Thomas'* second factor, but Plaintiff appears to argue that the facts supporting his municipal liability theory show that his *Monell* claims do not depend on individual officer liability. Like *Thomas*, this case involves allegations that the County's policies and customs led to chronic understaffing at the CCDC. *Thomas* noted that the individual defendants in that case could have argued that they were not deliberately indifferent to the plaintiff's medical needs because the County's policies created operational breakdowns at the jail that prevented the defendants from taking appropriate action. *Thomas*, 604 F.3d at 305. Plaintiff contends that is the case here because a jury could find that the County's practice of understaffing the CCDC made it impossible for the correctional officers and medical staff to respond to his medical needs. (Resp. at 7.)

Plaintiff's argument is not without some merit. *See Terry*, 2010 WL 2720754, at *3 (finding a similar argument to weigh

against bifurcation). Nevertheless, the amended complaint is not limited to a custom and practice theory of municipal liability. It also alleges that Cook County failed to provide adequate "suicide prevention education and training for its staff members." (Amend. Compl. at ¶ 43.) As such, Plaintiff asserts a failure-to-train claim as part of his *Monell* action. A municipality can be held liable for damages under *Monell* when the need for specialized training is so apparent that the failure to provide it can be attributed to the municipality's deliberate indifference to such a need. *See, e.g., Erwin v. County of Manitowoc*, 872 F.2d 1292, 1298 (7th Cir. 1989).

The Seventh Circuit has been very clear since *Thomas* was issued that in a failure-to-train case "a municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee." *Sallenger v. City of Springfield, Ill.*, — F.3d —, 2010 WL 5128850, at *5 (7th Cir. Dec. 17, 2010) (citing *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) ("[T]here can be no liability under *Monell* for failure to train when there has been no violation of the plaintiff's constitutional rights.")). It is not the case, therefore, that all of Plaintiff's claims against Cook County are necessarily independent of those asserted against the individual defendants; if his § 1983 claims against the individual defendants fail, his failure-to-train allegations against the

County will also fail under *Sallenger*. As a result, this aspect of Plaintiff's *Monell* liability theory does not fully accord with the second of the *Thomas* elements.

Finally, Plaintiff contends that he satisfies the third *Thomas* factor related to defenses because the individuals in this case have asserted the affirmative defense of qualified immunity. As noted above, *Thomas'* interpretation of *Heller* was based on the fact that the individual defendants in *Heller* did not assert any defenses; had they done so, the *Monell* claim could have been independent of any finding of individual liability because a jury could have concluded that the officer violated the plaintiff's constitutional rights but was otherwise shielded from liability for that harm. *Thomas*, 604 F.3d at 304-05. Likewise, Plaintiff contends, the defendants' reliance on qualified immunity means that his *Monell* claims can go forward against the County "even if there was an absence of individual liability." (Resp. at 7.)

This argument overlooks the fact that the County has stipulated that, if any of the individual defendants are found to have violated Plaintiff's constitutional rights, it agrees to an entry of judgment against it for compensatory damages without an independent determination that the harm was caused by an official custom or policy.[1] Plaintiff need not show under this agreement

---

[1] The stipulation is not dated and was filed as an exhibit to the County's reply brief. Plaintiff, therefore, may not have been aware of it when he filed his response, but he has not sought leave to

that the individual defendants are actually liable for damages, only "that any Cook County or Sheriff employee violated [his] constitutional rights as alleged in [the] Complaint." (Reply at Ex. 1.) Plaintiff does not address this issue directly, but he cites *Bell v. City of Chicago*, 2010 WL 432310 (N.D. Ill. Feb. 3, 2010) as general support against bifurcation. *Bell* involved a similar stipulation in a false arrest context and noted that, under its terms, a qualified immunity defense would not preclude the city from paying *Monell* damages as long as a jury concluded that the city's employee violated the plaintiff's constitutional rights. *Bell*, 2010 WL 432310, at *3. Nevertheless, *Bell* declined to bifurcate the *Monell* issues on the ground that a jury might be confused by being required to enter, on the one hand, a verdict finding in favor of the plaintiff or defendant and, on the other hand, a separate verdict as to whether the defendant violated the plaintiff's constitutional rights. *Id.*

Other courts, however, have not found that such a dual determination precludes bifurcation. In *Almaraz v. Haleas*, 602 F. Supp.2d 920 (N.D. Ill. 2008), a substantially similar stipulation provided the decisive factor in overcoming that court's traditional reluctance to grant bifurcation. *See Almaraz*, 602 F. Supp.2d at 924 ("Ordinarily, this bench does not bifurcate cases[.]"). Like the one here, the stipulation in that

---

file a sur-reply to address the stipulation issue.

case also stated that the municipal defendant would pay *Monell* damages on a showing that one of its employees had violated the plaintiff's constitutional rights. *Id.* at 923. As in *Bell*, the court noted that, if the individual defendants prevailed on qualified immunity, it would be necessary to make a separate finding as to whether they violated the plaintiff's constitutional rights. *Id.* at 924. *Almaraz*, however, did not find this to be a factor weighing against bifurcation, in part, because the court construed the stipulation to mean that a finding on summary judgment would suffice as well as one by a jury at trial. *Id.*

Here, the Court does not need to interpret the agreement's language to reach a similar result because, unlike the one in *Almaraz*, the County's stipulation explicitly states that the County will pay *Monell* damages if a constitutional violation is determined either by a finder of fact or "through a dispositive motion." (Reply at Ex. 1.) Thus, a jury verdict may not be required to determine whether the individual defendants violated Plaintiff's constitutional rights. Even if such a verdict is necessary, however, Plaintiff has not addressed the County's reliance on its stipulation; he limits his argument to the position that he can prevail on his *Monell* claims even if the

individual defendants are found not to be liable under § 1983.[2]

As *Thomas* states, "a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict." *Thomas*, 604 F.3d at 305. The Court's consideration of the liability issues is limited by the fact that the County has presented little argument on *Thomas*, and Plaintiff has not fully addressed all the *Thomas* factors. Thus, he has not shown how *Thomas* precludes bifurcation under these facts. The County's relative silence on this issue is not fatal to its motion because, as explained more fully below, the County's focus on the burdens of discovery and the possible prejudice to the parties is well placed in this case. These factors are the primary concerns of Fed. R. Civ. P. 42(b), and

---

[2]  Plaintiff briefly states that proceeding directly on his *Monell* claims could deter future official misconduct. (Resp. at 5.) Courts in this district have reached different conclusions about the possible effects of subjecting official misconduct to damage awards. *Compare Medina*, 100 F. Supp.2d at 896 ("Deterrence of future misconduct is a proper object of our system of tort liability") *with Parker v. Banner*, 479 F. Supp.2d 827, 833-34 (N.D. Ill. 2007) (questioning the deterrence value of a separate *Monell* judgment). Here, Plaintiff's statement is not supported by a discussion of the deterrence value of a payment of money on his custom and policy claims against the County, and he fails to address the fact that the County has already agreed to pay damages awarded to the individual defendants for any § 1983 compensation awarded against them. The County is also statutorily obligated to indemnify the individual defendants for judgments resulting from harms they inflict while acting within the scope of their employment. *See* 745 ILCS 10/9-102. Plaintiff points out that he may be able to recover additional compensatory damages from the County if a jury awards him only nominal damages on his individual claims, (Resp. at 8-9), but he asserts this argument to support his opposition to bifurcation, not in relation to his deterrence claim.

"[w]hen weighing the competing equities under [that Rule],
prejudice is the Court's most important consideration." *Real v.
Bunn-O-Matic Corp.*, 195 F.R.D. 618, 621 (N.D. Ill. 2000). The
Court, therefore, turns its attention to the substance of the
County's argument on these central issues.

## II. *Monell* Discovery Burdens

*Monell* discovery "can add significant time, effort, and
complications to the discovery process," *Medina*, 100 F. Supp.2d
at 895, and courts have been willing to delay such discovery even
when *Monell* issues are not bifurcated from claims against
individual defendants. *See Clarett*, 2011 WL 37838, at *3.
Accordingly, Cook County asks the Court to stay discovery on the
*Monell* issues because requiring the parties to go forward on them
at this point would result in considerable expenditures of time
and money that may not be required in the end. Plaintiff has
already propounded "measureless requests," the County argues,
that will require it to produce many thousands of documents
related to its policies and customs. (Def's. Mot. at 8.)

That is not the case, Plaintiff responds, because he has
already agreed to limit the original discovery requests to which
the County refers. In fact, Plaintiff argues that the County's
discovery burdens would be minimal if bifurcation is denied and
discovery proceeds because his requests largely duplicate what
the County produced in the *Thomas* litigation as well as items it

15

has been required to provide in on-going inspections of the CCDC. (Resp. at 9, 11.)

The record before the Court does not support Plaintiff's argument that substantial burdens will not be imposed here because he has agreed to modify his discovery requests. Plaintiff points to a letter sent to the County on October 8, 2010 that agrees to limit the number of his requests for production to a time period extending from January, 2006 to the present. (*Id.* at Ex. 1.) As neither party has submitted the original requests, however, the Court is not certain about the degree to which this modifies the concerns expressed by the County or what portion of the original discovery requests remain unchanged by the letter. Without deciding whether Plaintiff's requests are overly broad, as the County claims, the Court's review of the October 8 letter shows that his requests still involve at least a considerable portion of the burdens often associated with *Monell* issues. For example, Plaintiff asks for all of the Sheriff Department's "policies, procedures, requirements, prerequisites, General Orders, practices, rules . . . departmental memorandums and/or departmental practices[.]" (*Id.*) Moreover, he seeks the complete computer database of investigations undertaken by the Sheriff's Department, all documents relating to prior claims of suicide or inadequate medical care, and asks the County to confirm that no documents

exists on a wide range of topics. (*Id.*) Even if these requests are proper or even necessary to Plaintiff's *Monell* claims, he has not shown why they impose the kind of minimal burden on the County that he describes in his response brief.

Plaintiff attempts to support his discovery argument by claiming that Cook County has already produced in the *Thomas* litigation all the information he seeks. He provides no support for this claim, however, and the Court has no evidence of what any of the defendants in that case were asked to produce. On its face, *Thomas* appears to have included discovery on a range of issues that do not fully overlap with those presented here. *Thomas* involved evidence of a systemic breakdown in the collection and processing of written medical claims that inmates were required to place in locked boxes, an issue that is not raised by Plaintiff's allegations that he made vocal outcries for help. *Thomas* also involved the death of an inmate by pneumococcal meningitis – not suicide – and there is little reason to suppose that the defendants were required to produce documents related to investigations of suicides at the CCDC or the training given to its employees on suicide prevention. Plaintiff also overlooks the fact that, whatever the *Thomas* defendants produced, it was insufficient to demonstrate *Monell* liability against the Sheriff's Department. Indeed, the Seventh Circuit found that the evidence did not support a finding that

understaffing at the CCDC was even a contributing factor in the plaintiff's death. *Thomas*, 604 F.3d at 306. As the understaffing issue forms an important basis for Plaintiff's *Monell* claims, he would presumably wish to acquire more evidence than what was produced in *Thomas*, not merely to get what the County produced in that case.

Plaintiff's contention that the County has already produced all that he seeks as part of on-going investigations of the CCDC presents similar problems. In 1982, Cook County entered into a consent decree concerning the conditions of confinement at the Cook County jail, including the improvement of environmental, food, and health issues. *See Duran v. Dart*, 74 C 2949 (N.D. Ill. 1982). As a result of the decree, the John Howard Association of Illinois monitors the CCDC and submits periodic reports to the Northern District of Illinois.

Plaintiff attaches to his response a 119 page report by the Association dated January 15, 2010. Only six pages of the report, however, concern staffing at the CCDC, and the report concludes that 542 additional correctional officers are needed. (Resp., Ex. 2 at 60-65.) Plaintiff presents no argument as to what documents the County submitted to the John Howard Association or why they overlap with his requests to such a degree that the County's discovery burden would be minimal. The report itself states that it is based on a combination of twenty-

five visits to various jail complexes as well as documents received from the CCDC. (*Id.* at 1.) Although the CCDC may have submitted items concerning the number of correctional officers at the CCDC, Plaintiff's October 8 discovery letter plainly seeks far more from the County than such relatively limited information. Without evidence or clarification by the parties, therefore, the Court cannot determine from the report alone that the County's *Monell* discovery would be as light as Plaintiff claims.

Plaintiff's reliance on a ninety-eight page report on conditions at the Cook County jail issued by the United States Attorney's Office fares somewhat better than the John Howard Report. This report, issued on July 11, 2008, states that it was based on several visits to the CCDC as well as a review of various written policies, procedures, and reports. (*Id.*, Ex. 3 at 2.) The report describes in detail numerous deficiencies in the administration of the Cook County jail, including the CCDC's written policy on suicide prevention. (*Id.* at 66.) Again, however, Plaintiff provides no explanation as to what the County's full document production in relation to this report might have included or why it coincides with what he seeks in this case, pointing only to the report itself, without further argument.

Plaintiff's October 8 letter limiting his discovery requests

appears to seek a good deal more than the documents referred to largely in general terms by the U.S Attorney's report. There is no direct evidence, for example, that the County produced all of its computer databases related to CCDC investigations or all documents referring to any grievances or complaints about detainee deaths or suicide prevention at the CCDC, although the report does discuss individual incidents. As the County notes, hundreds of thousands of inmates have been treated within the timeframe requested by Plaintiff. (Reply at 10.) The U.S. Attorney's Office report suggests that some overlap exists between what the County provided and what Plaintiff requests, but the absence of any specific argument on this issue prevents the Court from determining that no substantial discovery burdens would arise in this case if *Monell* discovery is not stayed, as Plaintiff contends.

The County contends that staying discovery will avoid potential discovery disputes, an argument that assumes either that *Monell* discovery will never occur or that deferring it will somehow simplify the issues involved at a later date. Plaintiff counters this argument by claiming that his October 8, 2010 letter shows that disputes are already on the horizon and that some *Monell* evidence could overlap with what is relevant to the individual defendants. Some courts have denied bifurcation because it could complicate the discovery process by requiring

additional determinations as to whether some *Monell* evidence might be relevant to individual liability. *See Terry*, 2010 WL 2720754, at *3. Others have not found this to be a ground for staying discovery. *See Clarett*, 2011 WL 37838, at *3 (denying bifurcation but staying *Monell* discovery); *Elrod*, 2007 WL 3241352, at *6-7.

Plaintiff cites *Krueger Int'l, Inc. v. Federal Ins. Co.*, 647 F. Supp.2d 1024, 1042 (E.D. Wis. 2009) to support his discovery argument, but reliance on that case is not entirely well placed; *Krueger* was a declaratory judgment action involving insurance policies, and Plaintiff does not show how the issues presented there apply to his quite different *Monell* claims. Nevertheless, the fact that the Court has been able to review at least some of the *Monell* requests issued in this case, and the fact that they involve a very substantial number of CCDC inmate claims and records, persuades the Court that staying *Monell* discovery at this point is warranted.

In his response brief, Plaintiff claims that bifurcation could lead to more discovery disputes because the individual defendants may wish to draw on evidence related to the County's practice of understaffing the CCDC to defend themselves against his allegations of deliberate indifference. (Resp. at 11.) A plaintiff can show deliberate indifference, in part, only by demonstrating that the defendant had subjective knowledge of the

risks to his needs but disregarded them. *Collins v. Seeman*, 462
F.3d 757, 761 (7th Cir. 2006). *Thomas* noted that the defendants
in that case could argue that they were not deliberately
indifferent to the plaintiff's medical needs because the County's
practices made it impossible for them to respond appropriately.
*Thomas*, 604 F.3d at 305. Without determining whether *Monell*
evidence is, in fact, relevant to the defendants here, the Court
recognizes that some of them could also make the argument stated
in *Thomas* to show that they did not act with a culpable mind.
These defendants, of course, can come forward as the need arises
to seek discovery on those evidentiary matters that are necessary
to their defense.

Nevertheless, the amended complaint suggests that any
overlap in such evidence will be limited in scope. The amended
complaint names numerous defendants, but it only alleges one
instance in which a specific correctional officer actually knew
that Plaintiff required assistance and failed to provide it.
(Amend. Compl. at ¶ 26.) Instead, Plaintiff's allegations
against the correctional officers are premised in large part on
the absence of officers on Tier 2-H, not their knowing disregard
of his pleas for help. *See* Response at 13 ("The complaint
alleges that there was not an officer on the tier when Plaintiff
died . . . [and] one of the primary reasons for delay in
treatment of inmates is staffing which is a result of

underfunding."). Plaintiff provides no argument as to how the County's alleged policy of understaffing the CCDC would be relevant to officers who had no subjective awareness of his needs and who are not even alleged to have been present to hear his cries for help. Insofar as subsequent discovery shows that other officers heard his pleas but ignored them, any evidence related to understaffing at the CCDC appears to be considerably more limited than the extensive *Monell* requests that are currently outstanding.

It is well established that "[w]hether the *Monell* claims so overlap with the remaining claims as to undermine any efficiencies to be derived from bifurcation of discovery is a decision that must be made on a case-by-case basis." *Elrod*, 2007 WL 3241352, at *7. The Court, therefore, must weigh any overlap that might exist between the evidence relevant to the claims in this case against the fact that Plaintiff has already propounded the significant discovery requests described above. Under these facts, the Court believes that the burdens of proceeding with *Monell* discovery outweigh the potential costs of time and money associated with disputes that may arise as a result of a bifurcation of claims and a stay on *Monell* discovery.

### III. Potential Prejudice to the Parties

As a final matter, the County contends that failing to bifurcate the *Monell* issues or to stay discovery would seriously

prejudice the individual defendants. The County argues that the claims against the individuals require different standards of proof than do those against the municipal defendants, and that the introduction of evidence relevant to claims against the County could unfairly sway a jury's decision against the individual defendants. (Def's. Mot. at 9-10.)

For his part, Plaintiff claims that bifurcation would prejudice him. He argues that his expert witness needs to review all of the custom and policy evidence that will be introduced against the County in order to determine the proper damages against the individual employees. Moreover, he argues, any delay in *Monell* discovery would prevent him from gathering relevant evidence from CCDC inmates as they become more difficult to locate and their memories of events fade. (Resp. at 13-14.)

Plaintiff's response strongly suggests that his *Monell* claims against the County will involve a significant portion of the evidence supporting the two reports discussed above on the management of the Cook County jail. Indeed, he cites the U.S. Attorney's report in his amended complaint. (Amend. Compl. at ¶¶ 47-48.) This is not a case, therefore, where the familiar argument that individual defendants may be prejudiced by evidence supporting municipal liability rests on contested discovery requests or allegations in the complaint. The U.S. Attorney's Report, in particular, presents extensive descriptions of

improper care and management procedures in eleven areas at the
CCDC, including medical screening (graphically described as
"chaotic, noisy, and crowded"), acute care ("grossly
inadequate"), emergency care ("deficient"), and suicide
prevention ("grossly inadequate"). (*Id.*, Ex. 3 at 43, 46, 50,
66.)

The breadth and seriousness of the alleged deficiencies in
these areas – all of which appear to be relevant to claims
against the County – give rise to a serious threat of prejudice
to the individual defendants if such evidence is introduced at
their trial. Although the Court recognizes that not every detail
of the report will necessarily be relevant or admissible at
trial, it contains multiple instances of indifferent medical
personnel and correctional officers. As one example, among many,
the report details how inattentive medical technicians stood
chatting for forty-five minutes while an inmate in the same room
lost consciousness from severe chest pains. (*Id.* at 50.)
Plaintiff's obvious intent to introduce similar evidence of
problems at the CCDC leads the Court to conclude that, without
bifurcating the *Monell* claims under these facts, the individual
defendants could face unusual difficulty in distinguishing their
own acts that allegedly violated Plaintiff's constitutional
rights from evidence that would be introduced to support claims
against the County. *Cf. Medina*, 100 F. Supp.2d at 897 (finding

25

no prejudice when "neither the parties nor the Court has the least idea what evidence actually would be offered at trial on the *Monell* claim or just how prejudicial that evidence might actually be to the officers.").

Plaintiff's contention that his expert needs the *Monell* evidence to prove damages against the individuals is not entirely clear. A plaintiff can establish deliberate indifference against a prison official by showing that his condition was objectively serious, a standard that requires a medical condition that "has been diagnosed by a physician . . . or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008). He must also show that the official acted with a culpable state of mind by demonstrating that she had subjective knowledge of the health risk and disregarded it. *Collins*, 462 F.3d at 761. Plaintiff presents no reason, however, as to why he needs *Monell* evidence to establish this subjective standard against any of the individual defendants or, in particular, why it would be relevant to calculating damages against them. He claims that his expert will need personnel files to determine if CCDC's employees had proper training, but this would appear to be evidence relevant to municipal, not individual, liability.[3] *See Woodward v.*

---

[3]   The amended complaint does include several supervisory defendants, who can be sued in their individual capacities if they were personally involved in the deprivation of a constitutional right,

*Correctional Med. Svcs. of Illinois, Inc.*, 368 F.3d 917, 929 (7th Cir. 2004). Accordingly, Plaintiff fails to explain why evidence concerning Cook County's policies and procedures is so necessary to his case against the individual defendants that he would be prejudiced by bifurcation and a stay on discovery.

As a final matter, Plaintiff argues that bifurcation and a stay on *Monell* discovery will prejudice him because he will be unable to locate relevant CCDC inmates, whose memories of events will fade in the meantime. The Court finds this argument unpersuasive. Bifurcating claims and staying *Monell* discovery does not prevent Plaintiff from identifying potential *Monell* witnesses if he so desires; it merely defers the ordinary discovery process between the parties on these issues under the Federal Rules of Civil Procedure. As part of his claims against the individual defendants, Plaintiff will presumably be able to identify and depose a number of inmates who can provide evidence concerning his alleged outcries on the evening of September 27 or the absence of guards on Tier 2-H. He will be free to pursue discovery from these inmates as well as others who witnessed

---

directed the conduct causing it, or turned a blind eye to it. *See Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001). However, Plaintiff does not base his prejudice argument on a distinction between supervisory and non-supervisory employees, nor does he claim that he needs *Monell* evidence to show that any defendant violated his constitutional rights. He only contends that bifurcation will prevent his expert from reviewing important information that is required to prove damages. (Resp. at 13.)

Cermak's intake, the absence of correctional officers, the delays in obtaining help, and the arrival of paramedics. Plaintiff does not argue that discovery from these inmates will be insufficient to support his *Monell* claims or that he will be unable to identify other inmates based on the evidence he gathers as part of discovery on his deliberate indifference claims.

For these reasons, the Court finds that failing to bifurcate the *Monell* claims from those asserted against the individual defendants poses a serious threat of prejudice to those individuals.

## Conclusion

For the reasons explained above, the County's Motion to Bifurcate and Stay *Monell* Discovery is granted. Discovery and trial on Plaintiff's *Monell* claims are stayed until his remaining claims in this case have been resolved.

Date: February 16, 2011.

ENTER:

_Arlander Keys_
ARLANDER KEYS
United States Magistrate Judge