**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSEPH DEMOUCHETTE, Jr., et. al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 09 C 6016 |
| | ) | |
| vs. | ) | Judge Manning |
| | ) | Magistrate Judge Keys |
| SHERIFF OF COOK COUNTY THOMAS | ) | |
| DART, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' JOINT MOTION TO EXCLUDE THE TESTIMONY OF ROBERT GREIFINGER, M.D. AND THOMAS F. NORRIS**

NOW COME Defendants THOMAS DART, RICHARD MASON, SEAN ROBINSON, SERGEANT TURNER, CHIEF MARTINEZ, CHIEF SALAZAR, SERGEANT HAYES, DIRECTOR ROMERO, SUPERINTENDENT JANUS, ANTHONY MARTELLO and JAMIE HERNANDEZ, through their attorney, ANITA ALVAREZ, State's Attorney of Cook County, by her assistant, Michael L. Gallagher, and Defendant COOK COUNTY, through its attorney, ANITA ALVAREZ, through her assistant, Kevin Frey, and herby jointly move to exclude the testimony of Plaintiffs' retained expert witnesses Robert Greifinger, M.D. and Thomas F. Norris. In support of this motion, Defendants state as follows:

**INTRODUCTION**

Plaintiffs filed their complaint based upon allegations stemming from the September 28, 2008 suicide of Joseph Demouchette ("Demouchette"), which occurred in Division 5 of the Cook County Jail ("CCJ"). (Exhibit ("Ex.") 1, Plaintiffs' Amended Complaint, at ¶¶ 15, 18).

1

Plaintiffs' allegations include numerous theories of recovery including a claim of deliberate indifference against multiple Defendants in their individual and official capacity. (Ex. 1 at ¶ 1). On February 16, 2011, the Court granted Defendants Sheriff Thomas Dart and Cook County's ("Cook County" or the "County") motion to bifurcate "Plaintiff's §1983 claims against [them] pending the result of claims against the individual defendants and to stay discovery on claims involving Cook County customs and policies related to the operation of the [CCJ]." As a result, the parties' expert's opinions should be limited to whether the individual CCJ Officers were deliberately indifferent to Demouchette's suicide risk, *not whether* the County Defendants had an unconstitutional custom, practice or policy.

Pursuant to Federal Rule of Civil Procedure 26(a)(2), Plaintiffs have named Robert Greifinger, M.D. and Thomas Norris to provide opinion testimony and expert report. (Ex. 2, Plaintiffs' 26(a)(2)(A) Disclosures; Ex. 3, Report of Robert B. Greifinger, M.D. dated July 8, 2011; Ex. 4, Report of Thomas F. Norris dated July 11, 2011). Dr. Greifinger and Mr. Norris opined that there were no "red flags" apparent to the individual Defendants indicating that Demouchette was a suicide risk.

> Q. In this matter, what are the warning signs or red flags that were apparent to the Cermak medical personnel or the Sheriff Correctional personnel that Mr. Demouchette was suicidal?
> A. There weren't any. (Ex. 5, Deposition Transcript of Robert B. Greifinger, M.D., at 97).

Instead, Plaintiffs' experts provide the opinion that the County Defendants failed to institute certain policies, practices and customs that *could* have prevented Demouchette's suicide. Not only are the experts' opinions irrelevant at this stage in the litigation, but the methodology used to formulate their opinions is flawed and based upon nothing more than speculation and conjecture. Therefore, this Court should exclude their opinions in this matter.

2

**ARGUMENT**

"Federal Rule of Evidence 702 allows an expert witness to testify about a relevant scientific issue in contention if his testimony is based on sufficient data and is the product of a reliable methodology applied to the facts of the case." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). "Under the *Daubert* framework, the district court is tasked with determining whether a given expert is qualified to testify in the case in question and whether his testimony is scientifically reliable." *Gayton*, 593 F.3d at 616, citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993)). "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990).

"For a witness to be considered an 'expert,' Rule 702 requires that person to be qualified as such 'by knowledge, skill, experience, training, or education." *Lewis v. Citgo Petroleum Corp.*, 561 F. 3d 698, 705 (7th Cir. 2009) *cert. denied*, 130 S. Ct. 1025 (2009). "[S]imply because a doctor has a medical degree does not make him qualified to opine on all medical subjects." *Gayton*, 593 F.3d at 617. "The question [the court] must ask is not whether an expert witness is qualified in general, but whether his qualifications provide a foundation for [him] to answer a specific question." *Id.*, (internal citations omitted). This gate keeping function applies to all expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). The "specific question" at this stage in the litigation is whether the individual Officers were deliberately indifferent to Demouchette's suicide, not whether the County Defendants should have instituted certain policies that could have prevented that suicide.

3

In assessing the reliability of an expert's testimony, the court should consider the proposed expert's full range of experience and training in the subject area, as well as the methodology used to arrive at a particular conclusion. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). "Proposed testimony must be supported by appropriate validation, i.e., 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. In most cases, "[t]he expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." Fed. R. Evid. 702, advisory committee's notes (2000 amendment). "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.*

"Rule 702 imposes a special obligation upon a trial judge to ensure that any and all scientific testimony is not only relevant, but reliable." *Clark*, 192 F.3d at 756 (internal citation omitted). Rule 702 admits only "scientific knowledge," and not speculation or subjective belief. *Daubert*, 509 U.S. at 590. The Supreme Court in *Daubert* lists four factors that courts should consider when determining whether testimony is reliable: (1) whether the theory or technique can be tested; (2) whether it has been subject to peer review; (3) whether the technique has a known or potential rate of error; and (4) whether the theory has attained general acceptance in the relevant community. *Id.* at 593-94. The Seventh Circuit has stated that the "Rule 702 inquiry is 'a flexible one'" and it has given "the district court wide latitude in performing its gate keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable." *Bielkis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011) *quoting* Daubert, 509 U.S. at 594.

When a court engages in the reliability analysis, its' focus "must solely be on principals and methodology, not on the conclusions [experts] generate." *Daubert,* 509 U.S. at 595. "An expert's opinion must be reasoned and founded on data." *Bielkis*, 663 F.3d at 894. Opinion testimony also must be relevant to the case in that it logically advances a material aspect of the case. *Daubert*, 509 U.S. at 591. Under *Daubert*, scientific testimony does not assist the trier of fact unless the testimony has a justified scientific relationship to the pertinent facts. *Id*. The trial court must determine whether the expert is proposing to testify to scientific knowledge that will assist the trier of fact, which entails a preliminary assessment of whether the reasoning or methodology properly can be applied to the facts at issue. *Daubert*, 509 U.S. at 592-593; *see also*, FRE 104.

### A. DR. GREIFINGER

#### 1. Dr. Greifinger's Opinion Regarding the Customs, Practices or Policies of the County Defendants is Irrelevant to the Individual Officer's Liability

As stated *supra*, Rule 702 imposes a special obligation on the trial judge to ensure that any and all scientific testimony is relevant. *Clark*, 192 F.3d at 756. At this stage of the litigation, the only relevant issue is whether the individual Officers were deliberately indifferent to Demouchette's suicide. Dr. Greifinger confirms that there were no "warning signs or red flags that were apparent to the Cermak medical personnel or the Sheriff Correctional personnel that Mr. Demouchette was suicidal." (Ex. 5 at 97). Dr. Greifinger further confirms that none of the individual Officers knew that Demouchette was a suicide risk. (Ex. 5 at 109). As a result, Dr. Greifinger's opinion actually exonerates the individual Officers. However, Dr. Greifinger's opinion does not stop there. Instead, Dr. Greifinger opines that the Cook County Defendants were deliberately indifferent based on various customs, policies and practices. As argued more

5

fully *infra*, Dr. Greifinger's opinion on these matters should not only be barred as irrelevant, but barred as flawed and speculative.

### 2. Dr. Greifinger is not Qualified to Render an Opinion on Security Issues

While Dr. Greifinger has been found to be an expert in correctional health care on numerous occasions, it is clear that he should not be allowed to opine on security issues, yet he makes numerous opinions in that regard. The Seventh Circuit has recognized that the question that must be asked is whether a witness' qualifications provide a foundation for him to answer a *specific* question. *Gayton*, 593 F.3d at 617. There is nothing in Dr. Greifinger's background that would establish he has the requisite knowledge, education, skill or experience to opine on security issues. Dr. Greifinger was a pediatrician, but is now self-employed as a consultant on health care for incarcerated persons. (Ex. 5 at 7, 9). Dr. Greifinger's work focuses on doing investigation and monitoring work as it relates health care and public health. (Ex. 5 at 8). Yet, Dr. Greifinger opines on such topics as staffing issues and lockdowns. (Ex. 3 at ¶¶ 34, 35, 37) Dr. Greifinger's knowledge, skill, experience, and education are focused on medical care and not security. Thus, his qualifications do not enable him to provide a foundation to answer a specific question as to security issues. *Gayton*, 593 F.3d at 617. Therefore, his opinion in regards to any security issues should be stricken.

### 3. Dr. Greifinger's Opinions are Unreliable

#### a. Dr. Greifinger Fails to State what Standards He Relies Upon

The United States Supreme Court has held that "scientific implies a grounding in the methods and procedures of science" and that "knowledge connotes more than a subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. Dr. Greifinger's testimony and reports fail to provide any scientifically reliable testimony that meets the stringent standards of FRE 702

as construed by *Daubert*. Throughout his report, Dr. Greifinger makes sweeping conclusions concerning the care received by Demouchette without any discernable methodology, reliable data, or generally accepted standards to support his generalizations. Dr. Greifinger's initial report makes multiple references to the Defendants' actions falling far below the standard of correctional care. (Ex. 3 at ¶¶ 33-37) However, Dr. Greifinger fails to explain what the applicable standards are, where they come from or what they are based upon.

In Dr. Greifinger's initial report, he also references nationally accepted policies and procedures as well standards and practices in the correctional community without actually stating what these standards are. (Ex. 3 at ¶¶ 33-37). For example, during his deposition, Dr. Greifinger testified multiple times that the forms used by Cermak employees during intake screening were deficient in that they lacked certain questions that Dr. Greifinger believed should have been asked by the Cermak employees. (Ex. 5 at 37, 40, 60-64). However, Dr. Greifinger failed to cite to any correctional standard demonstrating that the screening forms used by the County were deficient or the failure to include additional questions violated a specific correctional standard. Dr. Greifinger completely ignored that this same screening setup allowed for Joseph Demouchette to receive care in 2004 and 2005, when he reported that he had medical and psychiatric conditions. (Ex. 6, Excerpts of Joseph Demouchette's Cermak Medical Records, at Cook County Cook County 19-24, 25-55, 58-74). Dr. Greifinger has offered no means of checking his conclusions or method of identifying whether any similarly situated persons would agree with his conclusions. *See Daubert*, 509 U.S. at 593-94.

The first reference Dr. Greifinger makes to a specific correctional standard comes in his supplemental report. In his supplemental report, Dr. Greifinger cited to Illinois Jail Standard 701.130(a)(3) which states "[d]ormitories housing more than 25 inmates must provide personal

7

continuous observation by staff, not including observation by a monitoring device." (Ex. 7, Supplemental Report of Robert B. Greifinger, M.D. dated January 18, 2012, at ¶ 6). Dr. Greifinger opined that the Defendants failed to meet Illinois Jail Standard 701.130(a)(3) in this case; however, Dr. Greifinger misapplied this standard to the facts of the case. (Ex. 7 at ¶ 6). The Illinois Jail Standards define a dormitory "as a multiple occupancy room that is designed to hold more than two inmates who are screened prior to admission for suitability to group living." Illinois Jail Standard 701.80(d)(1). Joseph Demouchette was not housed in a dormitory; he was housed in a cell with another detainee which makes Illinois Jail Standard 701.130(a)(3) inapplicable to this case. (Ex. 1 at ¶15). This fact demonstrates that there are flaws in Dr. Greifinger's methodology as he has cited to a correctional standard that is not applicable to this case in an attempt to support one of his opinions.

### b. Dr. Greifinger's Opinions are Conclusory in Nature

The conclusory nature of Dr. Greifinger's opinions, also expose flaws in his methodology. Dr. Greifinger opines that "[a] more complete medical and mental health evaluation, done in privacy, might have revealed his risk of withdrawal.[1] More likely than not, treatment of his withdrawal would have prevented suicide." (Ex. 3 at ¶ 33). Dr. Greifinger goes on to opine that the proximate causes of Joseph Demouchette's death were Defendants failure "to provide systems for careful intake screening in a private place, with reference to prior medical records, so as to optimize screening for the risk of drug withdrawal and suicide" and Defendants failure "to train and supervise health care staff to perform adequate intake screening." (Ex. 3 at ¶

---

[1] Dr. Greifinger admitted this initial opinion was poorly written and that what he had meant to opine was that "a more complete medical and mental health evaluation, done in privacy, more likely than not would have revealed his risk of withdrawal." (Ex. 5 at 53).

37). Dr. Greifinger's opinion that had a better screening system been in place, Demouchette would have revealed his risk of suicide due to drug withdrawal is incapable of being tested as Dr. Greifinger failed to set forth a basis for this opinion and is completely undercut by Demouchette's penchant for being untruthful and not completely forthcoming with his medical history. (Ex. 3 at ¶ 33, 37; Ex. 5 at 47-48, 64-65). *See Daubert,* 509 U.S. at 590.

Dr. Greifinger ignores the fact that Demouchette did not report any physical or mental health problems when he entered CCJ on September 27, 2008. (Ex. 6 at Cook County 15-17). In fact, Demouchette only reported medical or psychiatric issues during two of his seven intakes at the Cook County Jail. (Ex. 6 at Cook County 19-20, 55, 58). When Demouchette did disclose his problems, the evidence shows that he received treatment, which is an indication that the screening system does in fact work. (Ex. 6 at Cook County 21-24, 25-54, 59-74). Moreover, even in a private hospital setting, Demouchette lied about his drug use, his psychiatric issues and about what was troubling him. (Ex. 8, Excerpts of Joseph Demouchette's Medical Records from Various Outside Providers, at 481, 496, 525, 550-551, 553, 579-582, 587-590, 656-657, 672, 693-694, 696). Based upon Demouchette's pattern of being untruthful, Dr. Greifinger cannot opine that it would it have been more likely than not that Demouchette would have disclosed his problems because no matter what questions were asked and based upon Demouchette's history, it was more likely than not Demouchette would have failed to disclose that he was going through drug withdrawal or was feeling suicidal.

Dr. Greifinger attempts to dismiss the relevance of Joseph Demouchette's past medical history by opining that the relevant issues in this case were the systemic failures of the quality of the intake assessment procedure and the absence of continuous security coverage on the housing unit. (Ex. 7 at ¶ 4). Dr. Greifinger's refusal to acknowledge Demouchette's past medical history

9

highlights the fact that Dr. Greifinger has failed to connect Defendants' allegedly flawed processes to Demouchette's suicide. Dr. Greifinger cannot ignore the evidence, that time after time, Demouchette was not forthcoming with his medical history or what was really bothering him. Demouchette's medical history specifically refutes the doctor's opinions or, at the very least, calls for Dr. Greifinger to point to something that would demonstrate that Demouchette would have said something had there been a different setting and different questions being asked. "*Daubert* and the Federal Rules of Evidence require that a district court be willing and able" to exclude evidence that is too speculative in nature. *Target Marketing Publishing, Inc. v. Advo, Inc.,* 136 F.3d 1139, 1143 (7th Cir. 1998). Dr. Greifinger's failure to do this demonstrates that his opinions are conclusory and that he should be stricken as an expert in this matter. *See Target Marketing Publishing, Inc. v. Advo, Inc.,* 136 F.3d 1139 (7th Cir. 1998)(In affirming summary judgment for the defendant, the Seventh Circuit finds that the district court properly excluded plaintiff's expert report as unreliable under *Daubert*).

      **c. Dr. Greifinger's Opinion that Cermak's Failure to Access Demouchette's Prior Medical Records was a Proximate Cause in Demouchette's death is not Supported by the Evidence**

Dr. Greifinger's insistence that the failure by Cermak employees to access Demouchette's previous medical records was a proximate cause in Demouchette's death is as equally flawed as his other opinions as his deposition testimony exposes flaws in his methodology and undercuts this opinion. (Ex. 3 at ¶ 37). Dr. Greifinger admitted that it a temporary detention center's failure to employ an electronic medical record system or provide their medical staff with immediate access to a detainee's past medical records does not violate the standard of care. (Ex. 5 at 67-68). Instead, Dr. Greifinger testified that in his opinion, a detainee's previous medical records should be sought and reviewed by medical personnel within

"a day or so" of the detainee's arrival at the facility. (Ex. 5 at 68). However, Dr. Greifinger failed to cite to any correctional standard which would support his belief that a detainee's previous medical records were to be reviewed within "a day or so" by the facility's medical staff. Even if the standard were that jail medical personnel are to access a detainee's prior medical records within twenty-four hours of his arrival at the jail, that standard was not violated in this case as Demouchette committed suicide within twenty hours of his arrival at the Cook County Jail. (Ex. 6 at Cook County 18). So by Dr. Greifinger's own standard of "a day or so", Cook County's failure to access Demouchette's medical records was not a violation of the standard of care and could not have been a proximate cause of Demouchette's death.

### d. Dr. Greifinger's Opinion on Defendants' Alleged Failure to Train is not Supported by the Evidence

Dr. Greifinger opines that "[t]he Defendants failed to train correctional and health care staff to recognize the symptoms of drug withdrawal," and relies upon the depositions of Paramedic Ambrose and Officers Mason, Hernandez and Robinson to support this opinion. (Ex. 3 at ¶ 39). Dr. Greifinger's opinion is weakened by the fact that each of these individuals was able to testify as to some of the symptoms of drug withdrawal, as well as the fact they actually have observed individuals exhibiting signs of drug withdrawal. (Ex. 9, Deposition Transcript of George Ambrose, at 30-31; Ex. 10, Deposition Transcript of Richard Mason, at 37; Ex. 11, Deposition Transcript of Jaime Hernandez, at 36; Ex. 12, Deposition Transcript of Sean Robinson, at 28-29). Moreover, there is no evidence, nor is there any evidence cited to by Dr. Greifinger, that Joseph Demouchette exhibited any signs of drug withdrawal that would have put the Defendants on notice of his condition either while Demouchette was in the screening area or in his cell. (Ex. 5 at 83-84). In fact, Dr. Greifinger conceded it was possible that Joseph

11

Demouchette was not going through drug withdrawal. (Ex. 5 at 83). These facts expose the flaws in Dr. Greifinger's opinions and are yet another example of why he should be barred from offering opinion testimony in this case.

### e. Dr. Greifinger's Deliberate Indifference Analysis is not Supported by the Evidence

Dr. Greifinger concludes his initial report by stating that all of the named defendants were deliberately indifferent to the serious medical needs of Demouchette, but he fails to establish the methodology of how he arrived at this opinion or what evidence support it. (Ex. 3 at ¶ 41). This is most evident in the cases of the named correctional officers who were not even present on the date Demouchette committed suicide. For example, when presented with the fact that Officer Martello was not present when Demouchette committed suicide, Dr. Greifinger responded that Demouchette may have asked for help and *if* Officer Martello did not respond, he would have been deliberately indifferent. (Ex. 5, at 110-111). However, Dr. Greifinger admitted that there was no evidence that Officer Martello heard Demouchette's alleged pleas for help, and that if Officer Martello did not hear Demouchette's cries, he would not have been deliberately indifferent. (Ex. 5 at 111-112). When asked if there was anything else in the record to establish that Officer Martello was deliberately indifferent, Dr. Greifinger responded that there was not. (Ex. 5 at 112). "Proposed testimony must be supported by appropriate validation, i.e., 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. Dr. Greifinger has not supported his opinions with "appropriate validation" and because of that, he should not be allowed to given opinion testimony in this case.

### f. Dr. Greifinger's Reliance on the Department of Justice Findings Letter is Flawed for Multiple Reasons

Equally as troubling is Dr. Greifinger's use of the U.S. Department of Justice Findings Letter dated July 11, 2008 ("DOJ Letter") as a basis for his opinions. When asked at his deposition how the letter influenced his opinions, Dr. Greifinger testified that it "reinforced my opinion that there was needless harm in this case." (Ex. 5 at 32-33). Essentially Dr. Greifinger is opining that because of the DOJ allegations, anything bad that happens to a detainee at the Cook County Jail is the result of a failure in Defendants' systems. However, Dr. Greifinger has failed to link any of the alleged deficiencies discussed in the DOJ Letter to Demouchette's suicide. For example, the DOJ Report references a lack of privacy during intake screening due to detainees being handcuffed together while they are screened, however, there is no evidence that occurred in this case. (Ex. 13, Excerpts of the DOJ Findings Letter, at 43).

Dr. Greifinger's reliance on the DOJ Letter is troubling on a number of levels. The DOJ Letter suffers from motivational problems because it was prepared in anticipation of litigation against Cook County and the Cook County Sheriff pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 ("CRIPA"). The DOJ is required to provide public officials with 49 days notice of a violation before it bring an action. 42 U.S.C. § 1997b(a)(1). The letter states that it was submitted to fulfill "the statutory requirements of CRIPA." (Ex. 13 at 2). The inflammatory language used, as well as the self-serving nature of the report, indicates that the DOJ was only motivated to do one thing, bring some sort of action against the entities that run the Cook County Jail and force a settlement.

Also troubling is that fact that Dr. Greifinger had access to information that was not available to the parties. Dr. Greifinger had undocumented conversations with Cermak and Sheriff's employees and had access to other information that he could not disclose due to a confidentiality agreement. (Ex. 5 at 12-13, 17-18). Moreover, although Dr. Greifinger did not

author any portion of the psychiatric section of the DOJ Letter, he testified that he was familiar with the mental health program/suicide prevention program at the CCDOC because he worked closely with the principal psychiatric investigator. (Ex. 5 at 12-13). The information relied upon by Dr. Greifinger were not sworn statements and have not been subjected to any kind of scrutiny to determine the accuracy of the information. Without knowing what this information is, there is no way of knowing whether the information was the type that Dr. Greifinger could reasonably rely upon in coming to his opinions. Thus, Dr. Greifinger's use of the DOJ Report exposes flaws within his methodology and is another reason why he should be prohibited from giving opinion testimony in this matter.

### g. Dr. Greifinger Should be Prohibited from Offering Opinion Testimony in this Case

When this Court focuses on Dr. Greifinger's lack of principals and methodology, it is clear that his opinions are based purely on speculation and conjecture so that these opinions fit within the structure of Plaintiffs' theory of the case. *See Daubert*, 509 U.S. at 593-94. As illustrated above, there are too many instances where he fails to provide a basis for his opinions or his opinions are undercut by the facts of the case. Dr. Greifinger goes from point A to point C and skips point B by failing to point to actual evidence that it was Defendants or their systems that were the cause of Joseph Demouchette's death. This exhibits flawed methodology on the part of Dr. Greifinger and, ultimately this flawed methodology creates flawed opinions. As a result of Dr. Greifinger's clearly flawed methodology and the unreliability of his testimony under FRE 702, it necessarily follows his opinions and testimony cannot be relevant. Since there are no means by which Dr. Greifinger can articulate a mechanism by which a different outcome could have been achieved, he cannot assist the trier of fact, and this makes his testimony

irrelevant. Thus, this Court should strike Dr. Greifinger as an expert and bar him from providing opinion testimony in this matter due to the numerous analytical gaps in his opinions.

**4. Dr. Greifinger Has Been Stricken as an Expert Before**

This is not the first case where Dr. Greifinger has offered conclusory opinions based on speculation and conjecture. In *Dukes v. State of Georgia*, 428 F. Supp. 2d 1298, 1315 (N.D. GA March 30, 2006), the district court, in excluding Dr. Greifinger's testimony, found that "Dr. Greifinger's expert testimony [was] neither reliable nor relevant under the *Daubert* analysis" and concluded that it should be excluded under Federal Rule of Evidence 702. The district court in *Dukes* also found that Dr. Greifinger's opinions concerning standards of correctional healthcare were unreliable because he provided little quantifiable support for these conclusions other than his experience and even then he failed to make "reference to any specific experience or material upon which he relied in making his conclusions." *Dukes*, 428 F. Supp. at 1314-15. The district court went on to find that Dr. Greifinger's expert testimony was not relevant because it was nothing more than his "stamp of approval" on the allegations of the plaintiff, did "nothing to advance a material aspect of [p]laintiff's case" and did "nothing to assist the jury." *Id.* at 1315.

Much like what he did in the *Dukes* case and as discussed above, Dr. Greifinger stated that the actions of various Defendants fell below the standards of correctional health care, but failed to specify what experiences or what standards he relied upon in making those determinations. *Id.* at 1314-15. Like his opinions in the *Dukes* case, Dr. Greifinger's opinions in this case are nothing more than unsupported speculation that does nothing to assist the trier of fact. *Id.* at 1315. As referenced above, there are numerous facts of this case that do not support Dr. Greifinger's opinions. Dr. Greifinger "provides little quantifiable support for his conclusion[s]" and the lack of methodology behind Dr. Greifinger's opinions highlights the fact

15

that he has done nothing more than give "[h]is stamp of approval on the [Plaintiffs'] contentions" and "does nothing to advance a material aspect of [Plaintiffs'] case. *Id.* at 1314-1315. Like the court in the *Dukes*, this Court should prohibit Dr. Greifinger from offering opinion testimony in this case.

### B. Thomas F. Norris

#### 1. Mr. Norris' Opinion Regarding the Custom, Policies or Practices of the County Defendants is Irrelevant at this Stage in the Litigation

As stated *supra* in Section A(1), Mr. Norris' opinion regarding the County Defendants' alleged customs, policies and practices is irrelevant to the "specific question" of whether the individual Officers were deliberately indifferent to Demouchette's suicide. *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010). Mr. Norris acknowledges that there was nothing in the record to indicate Demouchette was a suicide risk, let alone that the individual Officers were aware of that risk. (Ex. 13, Deposition Transcript of Thomas F. Norris, at 86-95). Instead, the record establishes that no such risk existed: 1) there was no indication in the Hickory Hills Police Department report or the CCJ medical intake screening forms that Demouchette suffered from mental illness, had prior suicidal attempts, was currently suicidal, or was suffering from drug withdrawal; 2) there were no written requests from Demouchette or fellow detainees requesting medical treatment; 3) there was no statements from Demouchette's cellmate or fellow detainees that officers were notified that Demouchette was suicidal or suffering from drug withdrawal. (Ex. 13 at 88-92). In fact, during the approximately 20 hours Demouchette was in CCJ custody the first time he informed *anyone* of his suicidal ideations was when Demouchette told his cellmate that he was going to "fake" hang himself in order to get transferred to Cermak Hospital.

16

Instead of providing an opinion that the individual Officers knew or should have known that Demouchette was suicidal, Mr. Norris opines that "based on my limited review of the provided materials, that Mr. Demouchette's death may have been preventable had certain standard correctional practices been in place." (Ex. 4 at 4). Mr. Norris' opinion in this regard is irrelevant to the "specific question" of whether the individual Officers were deliberately indifferent to Demouchette's suicide and should be stricken.

## 2. Mr. Norris is not Qualified to Give an Opinion on Correctional Security

Mr. Norris is entirely unqualified to provide an expert opinion in the field of correctional security. In Mr. Norris' purported 13 years as a "correctional expert," he has never been qualified as an expert in state or federal court, he has only provided a single "expert" report, and he bases his qualifications - in part - on his experience as a correctional officer and supervisor from 1974-1985 and 1993. (Ex. 13 at 14-15, 28). Mr. Norris described the correctional facility that he worked at from 1974-1985 as a minimum-security federal facility that was a converted hospital, had an open dorm setting, and had no perimeter security wall. (Ex. 13 at 19-20). Mr. Norris went on to describe the typical inmate housed in this facility with the following: "[s]o one of inmates…was a former governor and federal judge of Illinois, Otto Kerner. That's the kind of inmates we housed in Lexington, so if that helps explain a little bit about the level of risk." (Ex. 13 at 23). Mr. Norris is correct that the above example describes the "kind of inmates" his facility incarcerated, but this description also emphasizes why Mr. Norris is wholly unqualified to opine regarding CCJ's correctional policies considering it houses some of the most violent detainees imaginable in the nation's largest single-cite Jail.

17

### 3. Mr. Norris' Opinions are Based on an Improper Standard

Mr. Norris concedes that his "findings can only be considered preliminary." (Ex. 13 at 62-63). Mr. Norris further concedes that his findings are based on a best practices standard promulgated by the American Correctional Association ("ACA").[2] (Ex. 13 at 117-18). As an initial matter, Mr. Norris specifically mentions ACA standards only *once* during his entire 134 pages of testimony and report. (Ex. 4 at 2). Mr. Norris states in his report that the ACA recommends that "correctional and health care personnel must be able to respond to health-related situations within a four minute response time." (Ex. 4 at 2). However, Mr. Norris cites an ACA standard that does not even exist. Instead, the ACA states that the "expected" (not "mandatory") practice is to require "[c]orrectional officer posts are located in or immediately adjacent to inmate living areas to permit officers to see or hear and response promptly to emergency situations."[3] (ACA Performance-Based Standards for Adult Local Detention Facilities 4th Ed. p.16, 4-ALDF-2A-03).

Misstatements of the ACA standards aside, Mr. Norris' opinion that the individual Officers violated the ADA standards is also conclusory in nature.

> Q. Is it your opinion that the officers and supervisors violated those [ACA] standards in this case?
>
> A. I think there is some question insofar as what's not clear to me is from the documents that I reviewed whether or not in looking at the logs, et cetera they don't really document frequency of rounds and it also appears supervisors made no attempt to read those for quality, et cetera. So based on those kinds of observations I have to call into question some the behavior, yes. (Ex. 13 at 118).

---

[2] ACA is a national correctional organization that provides policy recommendations and voluntary accreditation.

[3] Similarly, the Illinois County Jail Standards make no such "4 minute" response requirement.

Mr. Norris' response demonstrates his willingness to provide conclusory opinions without providing any discernible methodology, reliable data, or generally accepted standards to support his generalizations.

Mr. Norris' opinion should also be barred because he applied a best practice standard as opposed to the appropriate deliberate indifference standard.

> Q. So in your expert opinion an officer or the institution is liable if they haven't done everything they could possibly do in order to prevent a suicide.
> A. That's their job. (Ex. 13 at 76).

The above response clarifies that Mr. Norris would find the individual Officers and County Defendants liable for failing to do *everything* in their power to prevent Demouchette's suicide.

In stark contrast, the Supreme Court held in *Farmer v. Brennan* that a prison official may be held liable under the Eighth Amendment for acting with "deliberate indifference" to inmate health or safety only if he knows that the inmate faces a "substantial risk of serious harm" and disregards that risk by failing to take reasonable measures to abate it. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). The Court rejected an objective test for deliberate indifference and held that liability will lie only if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer* 511 U.S. at 837. The Court adopted the definition of "reckless" as defined in criminal law, which "permits a finding of recklessness only when a person disregards a risk of harm of which he is aware." *Id.* at 836-837. Therefore, Mr. Norris has misapplied a best practices or negligence standard in evaluating the Defendants liability and his opinion should be barred. *See Gayton v. McCoy,* 593 F.3d 610, 620 (7th Cir. 2010) ("Evidence that the official acted negligently is insufficient to prove deliberate indifference.")

19

**CONCLUSION**

WHEREFORE, for the reasons stated above, Defendants THOMAS DART, RICHARD MASON, SEAN ROBINSON, SERGEANT TURNER, CHIEF MARTINEZ, CHIEF SALAZAR, SERGEANT HAYES, DIRECTOR ROMERO, SUPERINTENDENT JANUS, ANTHONY MARTELLO, JAMIE HERNANDEZ and COOK COUNTY respectfully request that this Honorable Court grant Defendants' joint motion to exclude the testimony of Robert Greifinger, M.D. and Thomas F. Norris along with any such relief as this Court deems just and appropriate.

| | |
|---|---|
| Respectfully Submitted,<br>ANITA ALVAREZ<br>State's Attorney of Cook County | Respectfully Submitted,<br>ANITA ALVAREZ<br>State's Attorney of Cook County |
| By: /s/ Kevin Frey<br>　　Kevin Frey<br>　　Assistant State's Attorney<br>　　69 West Washington, Suite 2030<br>　　Chicago, Il 60602<br>　　(312) 603-1440 | By: /s/ Michael L. Gallagher<br>　　Michael L. Gallagher<br>　　Assistant State's Attorney<br>　　500 Richard J. Daley Center<br>　　Chicago, Il 60602<br>　　(312) 603-3124 |