## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

Joseph Demouchette, *et al.*,

        Plaintiffs,

        v.

Sheriff of Cook County Thomas Dart, *et al.*,

        Defendants.

Case No. 09 C 6016

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

This case arises from the death of Joseph Demouchette, a pre-trial detainee who committed suicide at Cook County Jail. Plaintiffs (the decedent's children and wife) have brought federal and state law claims against Cook County and certain prison officials (Sheriff Thomas Dart, Lieutenant Jaime Hernandez, Superintendent Stanley Janus, Officer Richard Mason and Sergeant Phyllis Turner). [62], Am. Compl. The prison officials will be collectively referred to as the "Sheriff Officers."

Cook County and the Sheriff Officers each have moved for summary judgment. For the reasons set forth below, Cook County's motion for summary judgment [184] is granted in part and denied as moot in part; and the Sheriff Officers' motion for summary judgment [194] is granted in part and denied in part.

## I.    Legal Standard

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir.

2014). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *See CTL ex rel. Trebatoski v. Ashland School District*, 743 F.3d 524, 528 (7th Cir. 2014).

## II. Background

The following facts are taken from the parties' Local Rule 56.1 statements (*see* [214]; [215]; [223]) and the exhibits attached thereto.

### A. Demouchette's Suicide

On September 27, 2008, the decedent Demouchette, who was then 30 years old and had a history of heroin addiction and mental illness, was arrested for domestic battery. [186-17], Greifinger Dep. Tr. at 83:17-24; [223] ¶¶ 1-4, 6. He was transported to Cook County Jail later that day. [214] ¶ 13; *see* [223] ¶ 7.

Upon arrival at Cook County Jail, Demouchette was placed in multiple holding cells while being processed. [214] ¶ 15. He underwent (among other things) medical history and psychological screenings conducted by Cermak Health Services (which is part of Cook County). [214] ¶¶ 17, 26; [215] ¶¶ 30-32, 45. Nothing unusual was recorded on the Medical Intake Form. [215] ¶ 38. The Primary Psychological Screening Tool Form recorded the answer "no" to questions about

Demouchette's drug use ("Do you use drugs?") and suicidal tendencies (such as, "Have you ever attempted suicide?"). [214] ¶ 26; [215] ¶ 52. There is expert testimony from Plaintiffs, however, that Demouchette "[m]ore likely than not" was experiencing heroin withdrawal during these screenings. [186-17], Greifinger Dep. Tr. at 83:5-16; *accord* [186-17], Greifinger Dep. Tr. at 33:17-21; [223] ¶ 91. Moreover, Demouchette's records from prior stays at Cook County Jail showed that he had used heroin and previously had attempted suicide. [223] ¶ 4.

Demouchette was assigned to the general population in Division 5, Tier 2-H. [215] ¶ 54. The Division 5 Tiers can be monitored by two closed circuit televisions. [214] ¶ 43.

On September 28, 2008, at 1:30 a.m., Demouchette was taken to Tier 2-H with other detainees and assigned a cell. [214] ¶¶ 29-30; [216-3], Officer's Living Unit Log at 0143. Another inmate also assigned to Tier 2-H (Alfred Johnson) testified that around 2:00 to 3:00 a.m. that night, he heard Demouchette calling out from his cell "CO, CO" for approximately 15 minutes. [214] ¶ 36; [223] ¶ 23. The officer assigned to Tier 2-H that night (Anthony Martello) does not recall hearing Demouchette calling out "CO, CO." [214] ¶ 37.

The record also includes an investigation report describing "in summary but not verbatim" statements from Demouchette's cellmate (Adair Davidson) that Demouchette appeared "dope sick" (a colloquial term referring to someone experiencing drug withdrawal, typically from an opiate such as heroin) and vomited two or three times that night. [216-2], Investigation Report; [223] ¶ 24. Unsworn

statements from an investigation report are hearsay, however, and cannot be considered as part of this Court's judgment. *Collins v. Seeman*, 462 F.3d 757, 760 n.1 (7th Cir. 2006). To this point, some of the statements attributed to Davidson in the investigation report are hearsay within hearsay. The report describes a conversation Lieutenant Hernandez stated he had with Davidson. [216-2], Investigation Report.

There is conflicting testimony about Demouchette's appearance the morning of September 28, 2008. Johnson, a detainee, testified that around 10:00 a.m. that day, he had a brief conversation with Demouchette who appeared "drowsy" and "dope sick." [214] ¶ 51; [223] ¶ 25. Johnson—who had accompanied Demouchette to Cook County Jail, in multiple holding cells and from processing to Tier 2-H—also testified that Demouchette did **not** appear "sick" or "dope sick" at those prior times. [214] ¶¶ 14, 16, 28; [215] ¶¶ 17-18, 55; *see also* [214] ¶ 30 (testimony from an officer during the night shift (Martello) that Demouchette appeared "the same as everyone else"). In contrast to the testimony from Johnson, Officer Mason, who was assigned to Tier 2-H, also saw Demouchette on the morning of September 28, 2008, but observed that Demouchette did not appear "physically ill." [214] ¶ 53.

Later that morning, around 11:00 to 11:30 a.m., Demouchette began to commit suicide by hanging himself. [223] ¶¶ 31-33, 35, 39. According to detainees and an officer, detainees began yelling and kicking at the doors and waiving at the security cameras to get an officer's attention. [214] ¶ 64; [223] ¶ 33, 39. The record contains conflicting testimony about how long it took an officer to come to

Demouchette's cell once these detainees began requesting help. There is testimony that it took anywhere from 10 (or less) to 30 minutes before an officer responded. [214] ¶¶ 63-64; [223] ¶ 35.

Officer Mason is one of the officers who responded. [223] ¶¶ 39-40. He was an officer assigned to Division 5, Tiers 2-G and 2-H, during the 7:00 a.m. to 3:00 p.m. shift on September 28, 2008. [214] ¶ 40. Officer Mason's responsibilities included conducting security checks every 30 minutes during his shift. [214] ¶ 45; [223] ¶¶ 30, 50, 68. That required Officer Mason physically to go cell-to-cell and observe the detainees. [214] ¶ 45. According to logbook records, Officer Mason completed security shifts for Tier 2-H at 10:04, 10:38, 11:00 and 11:28 a.m. [195-3], Mason Dep. Tr. at 31:14-32:3; [214] ¶ 46; [216-3], Officer's Living Unit Log at 0044.

Plaintiffs allege that Officer Mason falsely filled out the logbook for Tiers 2-G and 2-H on September 28, 2008 because he recorded conducting security checks at the exact same time for both tiers. [213], Pls.' Opp'n Br. at 8; [216-3], Officer's Living Unit Log at 0044, 0046; [223] ¶ 52. Sergeant Turner was the supervisor who signed these logbooks. [216-3], Officer's Living Unit Log at 0044, 0046; [223] ¶ 82. Officer Mason never has been disciplined for filling out inaccurate logbooks. [223] ¶ 83.

When Officer Mason responded, he saw Demouchette with one end of a bed sheet around his neck and the other end tied to the cell's window grate. [223] ¶ 40. Officer Mason called his supervisor and asked that medical personnel respond.

[214] ¶ 74; [223] ¶ 40.  He did not administer CPR to Demouchette.  [195-3], Mason Dep. Tr. at 61:8-14; [223] ¶ 40.

Once medical personnel arrived, they initiated CPR at 12:06 p.m. and called 911.  [214] ¶ 81; [223] ¶ 41.  The Chicago Fire Department responded and took Demouchette to the emergency room.  [214] ¶¶ 81, 88; [223] ¶ 42.

Demouchette was pronounced dead at 12:53 p.m. that very day.  [223] ¶ 42.  An autopsy was performed on Demouchette's body the next day (September 29, 2008), and the medical examiner's opinion was that Demouchette's cause of death was hanging, with the manner of death being suicide.  [215] ¶ 87.

### B.    Policies and Procedures at Cook County Jail

Plaintiffs allege that certain policies and procedures in place at Cook County Jail contributed to Demouchette's death.

First, Plaintiffs allege that Lieutenant Hernandez assigned officers to "cross-watch" tiers despite knowledge that cross-watching posed a safety risk.  [223] ¶ 48.  Cross-watching is where an officer monitors two tiers simultaneously—one physically and the other through a monitor.  [223] ¶ 46.  Lieutenants and superior officers decide whether officers should cross-watch tiers while on shift.  [195-4], Turner Dep. Tr. at 37:3-12; [223] ¶ 48.  The Department of Justice has put Cook County Jail on notice that cross-watching is "unacceptable and dangerous."  [223] ¶ 63.

Second, Plaintiffs allege that Lieutenant Hernandez did not adequately monitor his subordinate officers to ensure that they actually conducted security checks. [213], Pls.' Opp'n Br. at 12-13; [223] ¶ 83.

Third, Plaintiffs allege that there was an unsafe policy of officers not administering CPR. [213], Pls.' Opp'n Br. at 11-12. Lieutenant Hernandez testified that when there is a medical emergency, such as an inmate trying to hang himself, the procedure is for officers to contact medical staff and their supervisors to respond. [195-5], Hernandez Dep. Tr. at 30:22-32:13. Officers do not perform CPR on a detainee when they do not know what took place. [195-5], Hernandez Dep. Tr. at 32:16-34:1; [223] ¶ 60. It is not clear from the portions of the record cited by Plaintiffs whether or not Lieutenant Hernandez was responsible for creating or implementing this purported policy. *See* [223] ¶¶ 60-61.

## III. Analysis

### A. Federal Claim: Deliberate Indifference

Pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983, Plaintiffs brought deliberate indifference claims against all the individual Defendants, but only the claims against Officer Mason and Lieutenant Hernandez remain (*see* [64] and [172]) and are at issue here.[1]

The Supreme Court has interpreted the Eighth Amendment's prohibition on cruel and unusual punishment, incorporated through the Fourteenth Amendment, as imposing a duty on states to provide medical care to inmates. *Estelle v. Gamble*,

---

[1] Plaintiffs also brought a *Monell* claim against Cook County and Sheriff Dart (in his official capacity) but those claims were bifurcated [88].

429 U.S. 97, 103 (1976). Prison officials violate the Constitution if they are deliberately indifferent to a prisoner's serious medical needs. *Id.* at 104.

To prove a claim for deliberate indifference, a plaintiff must show: (1) that he had an objectively serious medical condition; (2) that the defendant knew of the condition and was deliberately indifferent to treating the plaintiff; and (3) that this indifference injured plaintiff. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). Circumstantial evidence is appropriate proof of deliberate indifference. *Foelker v. Outagamie County*, 394 F.3d 510, 513 (7th Cir. 2005).

Under the second prong, the official must have had subjective knowledge of the risk to the inmate's health, and he also must have disregarded that risk. *See Collins*, 462 F.3d at 761. Evidence that the official acted negligently is insufficient to prove deliberate indifference. *See Hicks v. Churchich*, 161 F.3d 1030, 1040 (7th Cir. 1998). Rather, "'deliberate indifference' is simply a synonym for intentional or reckless conduct, [and] 'reckless' describes conduct so dangerous that the deliberate nature of the defendant's actions can be inferred." *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999).

There is no dispute here that drug withdrawal and suicide are serious medical conditions. *See* [196], Sheriff Officers' Br. at 8; *Foelker*, 394 F.3d at 512-13 (drug withdrawal); *Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003) (suicide). For both Officer Mason and Lieutenant Hernandez, therefore, this Court will only consider the second and third prongs.

### 1. Officer Mason

Officer Mason argues that he was not deliberately indifferent and, even if he were, is nonetheless entitled to qualified immunity. [196], Sheriff Officers' Br. at 9-18.

### a) Deliberate Indifference

Construing all facts and reasonable inferences in the light most favorable to Plaintiffs (the nonmoving party), there is a genuine material dispute as to whether Officer Mason was deliberately indifferent. Under the requisite standard at this stage of the proceedings, Officer Mason may have learned there was a risk to Demouchette's health at two different times on September 28, 2008 but then disregarded that knowledge which contributed to Demouchette's death.

The first time is the morning of September 28, 2008, before Demouchette committed suicide. There is no dispute that Officer Mason saw Demouchette that morning. Officer Mason testified that he saw Demouchette multiple times that morning, including at 7:34 and 10:38 a.m. [195-3], Mason Dep. Tr. at 145:22-148:14; [214] ¶ 53. Officer Mason also would have seen Demouchette in the course of his duties. Officer Mason was charged with conducting 30 minute security checks ([223] ¶¶ 30, 50); and recorded that he conducted nine checks in Tier 2-H (where Demouchette was housed) during 7:00 to 11:00 a.m. ([214] ¶ 46; [216-3], Officer's Living Unit Log at 0044).

There is a genuine material dispute of fact as to whether Demouchette appeared to be dope sick that morning. One detainee (Johnson) saw Demouchette

around 10:00 a.m. (approximately 90 minutes before Demouchette committed suicide) and described him as looking "dope sick" and "drowsy." [223] ¶ 25; [195-8], Johnson Dep. Tr. at 8:10-9:4, 37:23-38:1. By comparison, Officer Mason testified that Demouchette did not appear "physically ill" that morning. [195-3], Mason Dep. Tr. at 145:22-148:14; [214] ¶ 53.

Assuming that Officer Mason saw Demouchette appearing dope sick, the record contains evidence from which a reasonable jury could conclude that the second and third prongs of the deliberate indifference test were met, that is, Officer Mason disregarded Demouchette's dope sickness and this disregard led to Demouchette's suicide. Plaintiffs have propounded expert testimony that Demouchette's drug withdrawal led him to commit suicide but could have been avoided had Demouchette received medical care for his drug withdrawal.[2] [216-2], Greifinger Expert Report ¶ 33; [223] ¶ 91.

This case is analogous to other decisions from this Circuit denying summary judgment for these reasons. *E.g.*, *Foelker*, 394 F.3d at 513-14; *Fox ex rel. Fox v. Peters*, No. 09 C 5453, 2011 WL 6378826, *6-7 (N.D. Ill. Dec. 19, 2011); *Thomas v. Sheahan*, 499 F. Supp. 2d 1062, 1092-93 (N.D. Ill. 2007). In *Thomas*, for example, the Court denied summary judgment where a factual issue existed as to whether the officers knew an inmate was sick. 499 F. Supp. 2d at 1091-93. The Court

---

[2] Defendants request that this Court strike the references to Plaintiffs' expert testimony. *E.g.*, [227], Sheriff Officers' Reply Br. at 7-8; [223] ¶ 91 (see response). Months before moving for summary judgment, however, the Sheriff Officers unsuccessfully moved to strike [151] this very expert testimony before the Magistrate Judge. This Court declines to revisit the Magistrate Judge's opinion [174] denying the motion to strike.

determined that the inmate was exhibiting "obvious signs of serious illness" at times when certain officers were on shift and performing security checks (also every 30 minutes). *Id.* at 1092. However, those officers did not procure any medical care for the inmate and the inmate died from meningitis and pneumonia. *Id.*

Likewise, in *Fox*, the Court denied summary judgment where "the only evidence implicating the officers was that they had been working while the [inmate] was showing obvious distress," such as vomiting and experiencing tremors and shakes. 2011 WL 6378826, *2, 6. The Court in *Fox* denied summary judgment even though these signs of illness were less severe than the ones in *Thomas*. *Id.* at *6.

The second time Officer Mason may have learned there was a risk to Demouchette's health was shortly after Demouchette began hanging himself. Inmates began kicking and banging on doors and waiving at the security cameras for help once Demouchette began to hang himself. [223] ¶¶ 33, 35. There is conflicting testimony and thus a genuine material dispute as to how long it took officers, including Officer Mason, to respond following this commotion—anywhere from 10 (or less) to 30 minutes. [214] ¶¶ 63-64; [223] ¶ 35. Officer Mason's knowledge of this commotion and the length of time it took him to respond bear on whether Officer Mason had knowledge of a risk to Demouchette's health and disregarded that risk. *See Collins*, 462 F.3d at 761.

The Seventh Circuit has found inmates kicking and shouting for attention as a signal to officers of possible medical distress. *Rice v. Correctional Medical*

*Services*, 675 F.3d 650, 680-81 (7th Cir. 2012). The Seventh Circuit also has described officers not responding to inmates kicking and shouting for attention as "particularly disturbing." *Id.* While the Seventh Circuit nonetheless granted summary judgment in *Rice*, it did so because it could not ascertain whether the guards actually heard the kicking and shouting. *Id.* at 681. The Court knew "very little" about how the jail was monitored and where the guards where were stationed. *Id.*

By comparison, the record here provides more information (albeit not extensive) that Officer Mason could have heard or seen the commotion following Demouchette hanging himself. Officer Mason was cross-watching Tiers 2-G and 2-H and thus may have been monitoring Tier 2-H by camera and have seen the inmates waiving at the security cameras for help. [223] ¶¶ 46-47. Moreover, from the logbook, Officer Mason may have been conducting security shifts in Tier 2-H while Demouchette was hanging himself. [214] ¶ 46. A reasonable jury may infer from those facts that Officer Mason heard or saw the commotion following Demouchette hanging himself but delayed responding.

The third prong of the deliberate indifference test—injury—also is met. Plaintiffs propounded expert testimony suggesting that delays in responding to Demouchette hanging himself contributed to his death. The expert concluded: "More likely than not, if an officer had been on the housing unit when Adair Davidson summoned help immediately and then seven to eight minutes later when a group of inmates summoned help, [Demouchette] could have been cut down and

revived by Cermak health care staff." [216-2], Greifinger Expert Report ¶ 35; *see also* [223] ¶ 38 (there is a four to eight minute window to save someone from a hanging death).

Plaintiffs also posit a third basis to establish that Officer Mason knew Demouchette was a suicide risk, but this third basis does not create a genuine issue of material fact. Plaintiffs argue that Officer Mason had knowledge of Demouchette's drug and medical history, including a prior suicide attempt, from his prison records. [213], Pls.' Opp'n Br. at 6-7. But the record does not show that Officer Mason ever reviewed or in the course of his duties must have reviewed these records, thereby foreclosing this basis for deliberate indifference. The Seventh Circuit reached the same conclusion in *Collins*, 462 F.3d at 761 n.2, where it held that inmates must show that the officers knew the contents of their prison medical records.

### b)    Qualified Immunity

Having found a genuine dispute of material fact, this Court now considers Officer Mason's argument that he is entitled to qualified immunity. [196], Sheriff Officers' Br. at 17-18. Qualified immunity shields an official from liability where the illegality of his conduct was not "clearly established" at the time he acted. *Cavalieri*, 321 F.3d at 622. The question here, therefore, is whether the law provided Officer Mason with "fair warning" that his conduct was unconstitutional. *See id.*

Officer Mason had fair warning. Before September 28, 2008 (the relevant time here), the Seventh Circuit held that delays in procuring medical care and responding to a suicide can support a deliberate indifference claim. *E.g.*, *Williams v. Liefer*, 491 F.3d 710, 716 (7th Cir. 2007) (delay in procuring medical care); *Cavalieri*, 321 F.3d at 622-24 (suicide). In *Cavalieri*, the Seventh Circuit concluded that the rule that officers will be liable if deliberately indifferent to a suicide risk was clearly established prior to 1998 (when the suicide there occurred). *Id.* at 623-24. That is 10 years before the time of the alleged misconduct here.

For the foregoing reasons, Officer Mason is not entitled to summary judgment.

### 2. Lieutenant Hernandez

In contrast to Officer Mason, there is no genuine dispute as to whether Lieutenant Hernandez was deliberately indifferent. The record shows that he was not.

Plaintiffs agree that Lieutenant Hernandez had no personal contact with Demouchette ([214] ¶¶ 3-4); and the record does not show that he knew Demouchette appeared dope sick or was suicidal. Instead, Plaintiffs argue that Lieutenant Hernandez participated in creating the prison conditions that led to Demouchette's suicide, such as assigning officers to cross-watch tiers, not instructing officers to commence CPR on detainees who appear to be having a medical emergency and ratifying inadequate cell checks by not disciplining the officers at fault. [213], Pls.' Opp'n Br. at 11-13.

To prevail against a supervisor for deliberate indifference, an inmate still must establish personal participation. The inmate must show that the supervisor was personally involved in the deprivation of a constitutional right, and directed the conduct causing it or turned a blind eye to it. *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001); *Thomas*, 499 F. Supp. 2d at 1093.

To begin with and as discussed in the background, it is not clear what role, if any, Lieutenant Hernandez had in creating or implementing the CPR policy. Lieutenant Hernandez further was not the one who signed Officer Mason's September 28, 2008 logbooks, so the record cannot show how Lieutenant Hernandez's alleged practice of ratifying inadequate cell checks contributed specifically to Demouchette's death. Even drawing all inferences in favor of Plaintiffs though, summary judgment is nonetheless warranted.

The very arguments Plaintiffs raise here were rejected in *Thomas*, and this Court finds no basis to depart from the Court's analysis there. In *Thomas*, the Court granted summary judgment to supervisors who lacked knowledge of the inmate's medical condition. 499 F. Supp. 2d at 1093. Instructive for the present case, the fact that the supervisors failed to take steps to remedy "serious health and security risks" that contributed to the inmate's death, including cross-watching and broken monitors, was insufficient for the inmate to maintain a claim against the supervisors where they lacked awareness of the inmate's medical condition. *Id.*

Plaintiffs instead draw an analogy to *Estate of Abdollahi v. County of Sacramento*, 405 F. Supp. 2d 1194, 1212 (E.D. Cal. 2005). [213], Pls.' Opp'n Br. at

13.    That case, however, supports granting summary judgment for Lieutenant Hernandez here—not denying it.  The plaintiffs in *Abdollahi* (the estates on behalf of certain inmates who committed suicide) brought deliberate indifference claims against two supervisors in their individual and official capacities.  *See* 405 F. Supp. 2d at 1209-10.

For the individual capacity claims, the plaintiffs argued that the supervisors were liable because they failed to take any remedial steps after certain jail suicides either through correction of policy, discipline or investigation.  *Id.* at 1210.  The Court rejected those arguments and granted summary judgment to the supervisors because the record contained no evidence that the supervisors had significant personal contact with the decedents or had ratified misconduct by subordinates. 405 F. Supp. 2d at 1210-11.  Similarly here, the record shows that, far from ratifying misconduct, Lieutenant Hernandez met with his staff the day following Demouchette's suicide and instructed them to be more observant and to better watch the detainees.  [195-5], Hernandez Dep. Tr. at 88:4-89:8; [223] ¶ 55.

The part of *Abdollahi* that Plaintiffs quote—about encouraging inadequate cell checks by failing to discipline the subordinate officers at fault, 405 F. Supp. 2d at 1212—involves official capacity claims against the supervisors and thus is inapplicable here.  [213], Pls.' Opp'n Br. at 13.  Official capacity claims represent another way of pleading a *Monell* claim against an entity.  *Estate of Abdollahi*, 405 F. Supp. 2d at 1212.  The *Monell* claims here, however, have been bifurcated ([64],

Order); and the relevant claim against Lieutenant Hernandez is in his individual capacity (*see* [62], Am. Compl.).

Because Lieutenant Hernandez did not violate any constitutional right, this Court does not need to consider whether he is entitled to qualified immunity. *See Cavalieri*, 321 F.3d at 620.

### B. State Law Claims

Plaintiffs have brought the following state law claims: wrongful death (Count II); survival action (Count III); intentional infliction of emotional distress (Count IV); negligence (Count V); *respondeat superior* (Count VI); and indemnification (Count VII). [62], Am. Compl. These claims have been brought against all Defendants except Counts VI (against Cook County and the Sheriff Tom Dart (in his official capacity) only) and VII (against Cook County only).

Cook County and the Sheriff Officers first raise a threshold argument against the state law claims, arguing that they are immune from liability under certain sections of the Local Governmental and Governmental Employees Tort Immunity Act ("Tort Immunity Act") (745 ILCS 10/1-101 *et seq.*). [193], Cook County's Br. at 7-13; [196], Sheriff Officers' Br. at 18-20. Defendants alternatively address the merits of some of the state law claims. [193], Cook County's Br. at 13-20; [196], Sheriff Officers' Br. at 20.

### 1. Threshold Issue: Immunity

Whether immunity is warranted is strictly a matter of law and thus properly resolved by summary judgment. *Wilkerson v. County of Cook*, 379 Ill. App. 3d 838,

847 (1st Dist. 2008). For the reasons set forth below, this Court concludes that Cook County is afforded immunity but that the individual Sheriff Officers are not.

### Cook County

Cook County argues that it is immune from liability under Sections 6-105 and 6-106(a) of the Tort Immunity Act because its alleged liability arises from injury caused by or resulting from a failure to examine or diagnose. [193], Cook County's Br. at 7-13. Plaintiffs disagree that the Act applies. They argue that the words "evaluate" (presumably Plaintiffs mean "examine," which is the statutory language) and "diagnose" are not found in the Amended Complaint and that Cook County's liability instead is premised on its "willful and wanton acts or omissions." [217], Pls.' Opp'n Br. at 4-5, 8.

Section 6-105 grants immunity to a local public entity for injury caused by a failure to make an adequate examination:

> Neither a local public entity nor a public employee acting within the scope of his employment is liable for injury caused by the failure to make a physical or mental examination, or to make an adequate physical or mental examination of any person for the purpose of determining whether such person has a disease or physical or mental condition that would constitute a hazard to the health or safety of himself or others.

Section 6-106(a) relatedly grants immunity to a local public entity for injury resulting from a failure to diagnose an illness:

> Neither a local public entity nor a public employee acting within the scope of his employment is liable for injury resulting from diagnosing or failing to diagnose that a person is afflicted with mental or physical illness or addiction or from failing to prescribe for mental or physical illness or addiction.

18

These sections of the Tort Immunity Act do not contain a "willful or wanton" exception.

It is undisputed that Cook County is a "local public entity." *See* 745 ILCS 10/1-206. Thus the resolution of the immunity issue turns only on the "essence" of Plaintiffs' claims (and this Court is not bound by a party's own characterization of those claims). *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 516 (2000); *Hemminger v. Nehring*, 399 Ill. App. 3d 1118, 1125-26 (3d Dist. 2010); *Wilkerson*, 379 Ill. App. 3d at 847. Collectively, these appellate authorities instruct that Illinois law has created two categories of medical cases—(a) improper diagnosis and (b) improper treatment (when there is a correct diagnosis)—and that courts must ascertain the "gravamen" or "essence" of the suit, beyond what the plaintiff alleges.

In *Hemminger*, the plaintiff (individually and as special administrator of the estate of his deceased wife) asserted, as here, survival and wrongful death claims under Illinois law. 399 Ill. App. 3d at 1119-20. The decedent had a Pap smear months before her cervical cancer diagnosis. *Id.* The plaintiff alleged that the doctors and technicians (and their hospital) incorrectly interpreted the Pap smear test results as normal, and should have performed a cervical biopsy but did not. *Id.* at 1120. The medical defendants successfully moved for summary judgment, claiming immunity under Sections 6-105 and 6-106. *Id.* at 1119, 1125-26. The plaintiff disputed that the Tort Immunity Act applied based on his characterization of the allegations, namely, that he had not pled injury from a faulty examination or

diagnosis but rather from defendants' failure to "correctly interpret or supervise the interpretation of Pap smear slides." *Id.* at 1123. The court disagreed, concluding that the "essence" of the action was defendants' failure to properly examine and diagnose cervical cancer. *Id.* at 1125-26.

In *Wilkerson* too, the Court granted summary judgment where the alleged negligence was not based on the treatment the patient received but rather on the treatment she should have received had defendants correctly examined and diagnosed all of her medical conditions. 379 Ill. App. 3d at 847.

The instant dispute is based on a failure to diagnose—not treat. The essence of the allegations against Cook County here is that they failed to properly examine Demouchette and diagnose him as experiencing heroin withdrawal during the jail intake. This is confirmed by the initial pleadings and Plaintiffs' own arguments (including their opposition papers and expert testimony) that Demouchette's suicide resulted from deficiencies in the intake screening process.

Specifically, Plaintiffs commenced this lawsuit by alleging that "[d]uring the intake process, Defendants failed or refused to identify Demouchette's serious medical need of drug withdrawal." [62], Am. Compl. ¶ 16; *see also* [62], Am. Compl. ¶¶ 39, 70; [215] ¶¶ 5-6 (see Plaintiffs' responses). Plaintiffs reiterated that argument in their opposition papers by asserting that Cook County conducted an inadequate screening. For example, Plaintiffs alleged that Cook County failed "to ask pertinent questions" and "to appropriately refer detainees for further evaluation." [217], Pls.' Opp'n Br. at 8. In further support, Plaintiffs propounded

an expert report and deposition testimony replete with allegations that Demouchette's suicide resulted from deficiencies in the screening process:

> The Defendants failed to train and supervise health care staff to perform adequate intake screening. These failures were the proximate cause of Joseph Demouchette's death by hanging.

> \*\*\*

> Q. Obviously, Cook County, *i.e.*, Cermak Health Services failed to diagnose Mr. Demouchette [as] suicidal or going through drug withdrawals; correct?

> A. Yes.

> Q. This isn't a case where Cermak or the medical personnel at Cermak Health Services diagnosed him as suicidal or going through drug withdrawals and failed to provide him treatment; correct?

> A. Correct.

> \*\*\*

> If [Demouchette] had had a better intake screen that was not cursory, in a private place where he would be more likely to be open with his answers, it was more likely than not, that his history of mental illness and suicide attempts would have become apparent. Which would have led to a more intense evaluation. And that would change the course of his one-day stay in the facility.

> \*\*\*

> Q. How do you link a failure to train medical personnel to recognize symptoms of drug withdrawal to Mr. Demouchette's death?

> A. I think in the comment about a system deficiency, if staff are not sensitive to the signs and symptoms of drug withdrawal and are not aware that the period of withdrawal is a period of high risk for suicide, that they would be less likely to identify a suicide risk and intervene to prevent the suicide.

[186-17], Greifinger Dep. Tr. at 47:24-48:7, 82:13-22, 140:1-11; [216-2], Greifinger Expert Report ¶ 37; *see also* [186-17], Greifinger Dep. Tr. at 36:17-37:4, 37:6-14; [215] ¶ 96; [216-2], Greifinger Expert Report ¶ 33; [223] ¶¶ 15, 19, 21, 74, 92.

These facts, moreover, render the principal cases relied upon by Plaintiffs inapplicable. *See* [217], Pls.' Opp'n Br. at 6-8 (discussing *Cobige v. City of Chicago*, No. 06 C 3807, 2009 WL 2413798, *12, 15 (N.D. Ill. Aug. 6, 2009); *McMurry v. Sheahan*, 927 F. Supp. 1082, 1092 (N.D. Ill. 1996); and *Bragado v. City of Zion/Police Department*, 839 F. Supp. 551, 554 (N.D. Ill. 1993)). None contains any discussion of the Tort Immunity Act sections at issue here (6-105 and 6-106). These cases thus are not instructive.

Accordingly, Cook County's alleged liability is caused by and results from the failure to make an adequate examination and diagnose Demouchette's heroin withdrawal. That is the gravamen and essence of Plaintiffs' allegations (even if Plaintiffs can marshal stray allegations). Thus Cook County is entitled to immunity under Sections 6-105 and 6-106 of the Tort Immunity Act.

Because Cook County is afforded immunity, this Court denies as moot its substantive responses to Counts II to V (all state law claims that fail if Cook County is granted immunity).

### The Sheriff Officers

The Sheriff Officers also claim immunity under the Tort Immunity Act, yet largely fail to develop their argument beyond stating particular sections that may apply. [196], Sheriff Officers' Br. at 18-19. Plaintiffs respond ([213], Pls.' Opp'n Br.

at 14-16)—correctly—that the Act carves out an exception to tort immunity where a public employee "knows from his observation of conditions that the prisoner is in need of immediate medical care and, through willful and wanton conduct, fails to take reasonable action to summon medical care." 745 ILCS 10/4-105. The standard for "willful and wanton conduct" is analogous to the one for deliberate indifference. *Chapman v. Keltner*, 241 F.3d 842, 847 (7th Cir. 2001); *see also Cobige*, 2009 WL 2413798, \*12 (collecting Seventh Circuit case law); *McMurry*, 927 F. Supp. at 1092.

As an initial matter, the consensus is that a county sheriff is a "local public entity" covered by the Tort Immunity Act—an issue not addressed by the parties. *Anton v. Sheriff of DuPage County, Illinois*, 47 F. Sup. 2d 993, 1003 n.4 (N.D. Ill. 1999). As such, the "willful and wanton" exception to Section 4-105 applies at least to Officer Mason. As discussed above, there is a genuine material dispute as to Officer Mason's deliberate indifference. These same and other facts may create a material issue of fact that the other Sheriff Officers (Sheriff Dart, Lieutenant Hernandez, Superintendent Janus and Sergeant Turner) also engaged in willful and wanton conduct. However, Sheriff Dart, Lieutenant Hernandez, Superintendent Janus and Sergeant Turner do not develop this issue in their motion papers (*see* [196], Sheriff Officers' Br. at 18-19); and this Court declines to infer reasons why they did not engage in "willful and wanton" conduct even if Officer Mason did. *See Mitsui Sumitomo Insurance Co., Ltd. v. Moore Transportation, Inc.*, 500 F. Supp. 2d 942, 956-57 (N.D. Ill. 2007).

### 2.    Negligence (Count V)

In response to Plaintiffs' negligence-based claim(s) (apparently at least Count V), the Sheriff Officers again argue that Demouchette's suicide is an intervening cause that severs any duty of care owed to him.  [196], Sheriff Officers' Br. at 20.

Suicide sometimes is unforeseeable and thus an intervening cause; however, this is not always the case and context matters.  *Jutzi-Johnson v. United States*, 263 F.3d 753, 756 (7th Cir. 2001).  An instructive example provided by the Seventh Circuit is where a hospital fails to watch a patient known to be suicidal and who commits suicide.  *Id.*  In that example, the duty of care claimed to have been violated is precisely the duty to protect against conduct which is ordinarily unforeseeable.

That is similar to Plaintiffs' allegations here: that the Sheriff Officers had knowledge that Demouchette was suicidal—or at least going through drug withdrawal—yet failed to exercise proper care.  In support,  Plaintiffs have propounded expert testimony that detainees going through drug withdrawal are at an increased risk of suicide; and that Demouchette's suicide was the result of his drug withdrawal.  [216-2], Greifinger Expert Report ¶ 33; [223] ¶¶ 88, 91.

Based on this factual record, there is a genuine material dispute as to whether suicide was a foreseeable injury here.  Thus, this Court denies summary judgment as to the Sheriff Officers on Count V.

### 3. *Respondeat Superior* (Count VI)

Because Cook County is entitled to immunity and the other Defendants may be liable, the last issue before this Court with respect to Cook County is whether it may be liable for the conduct of the other Defendants (*i.e.*, the Sheriff Officers). Based upon the record, Cook County is not, and its motion for summary judgment is granted as to Count VI.

Cook County argues that it is a different legal entity from the Sheriff of Cook County and thus cannot be liable for the Sherriff of Cook County's acts. [193], Cook County's Br. at 19-20. In the Amended Complaint, Plaintiffs alleged that "745 ILCS 10/9-102 requires Cook County to pay for a judgment entered against the County Sheriff in his official capacity." [62], Am. Compl. ¶ 86. Plaintiffs now abandon that allegation, claiming that they are "not attempting to hold Cook County liable for the unlawful conduct by the individual defendants." [217], Pls.' Opp'n Br. at 17; *see Wallace v. Masterson*, 345 F. Supp. 2d 917, 920-22 (N.D. Ill. 2004) (holding that Cook County is not liable under *respondeat superior* for the actions of the Sheriff of Cook County).

Plaintiffs instead argue that Cook County is liable for the conduct of its own employees. [217], Pls.' Opp'n Br. at 17-18. That argument is inconsequential. None of the remaining Defendants is a Cook County employee. *See* [214] ¶ 2. Rather, they are employees of a separate legal entity, the Sheriff of Cook County. Moreover, under the Tort Immunity Act, Cook County cannot be liable for the acts or

omissions of its employees unless the employees are independently liable. 745 ILCS 10/2-109. They are not.

Thus, Cook County's motion for summary judgment as to Count VI is granted.

## IV. Conclusion

Cook County's motion for summary judgment [184] is granted in part and denied as moot in part. Judgment on Counts II to VI is granted in favor of Cook County.

The Sheriff Officers' motion for summary judgment [194] is granted in part and denied in part. Judgment on Count I is granted in favor of Lieutenant Hernandez but not Officer Mason.

Accordingly, the following claims (other than the bifurcated *Monell* claim) remain against the following Defendants:

- Count I (deliberate indifference): Officer Mason

- Count II (wrongful death): the Sheriff Officers

- Count III (survival action): the Sheriff Officers

- Count IV (intentional infliction of emotional distress): the Sheriff Officers

- Count V (negligence): the Sheriff Officers

- Count VI (*respondeat superior*): Sheriff Dart (in his official capacity)

- Count VII (indemnification): Cook County

At the next status hearing, which was previously set for March 19, 2015 at 9:45 a.m., the parties should be prepared to schedule a pretrial conference and trial.

The parties also should be prepared to advise whether they wish to be referred to the Magistrate Judge for a settlement conference.

Dated: February 17, 2015

Entered:

_____
John Robert Blakey
United States District Judge